515 So.2d 741 (1987)
AT & T COMMUNICATIONS OF THE SOUTHERN STATES, INC., et al., Appellants,
v.
John R. MARKS, et al., Appellees.
No. 69732.
Supreme Court of Florida.
November 12, 1987.
Robert J. McKee, Jr., Atlanta, Georgia, and John P. Fons and Robert L. Hinkle of Aurell, Fons, Radey & Hinkle, Tallahassee, for AT & T Communications of the Southern States, Inc.
David Baumann, Atlanta, Ga., and Richard D. Melson of Hopping, Boyd, Green & Sams, Tallahassee, for MCI Telecommunications Corp.
Patrick K. Wiggins of Ranson & Wiggins, Tallahassee, for Microtel, Inc.
William S. Bilenky, Gen. Counsel and Harold McLean, Associate Gen. Counsel, Tallahassee, for Fla. Public Service Com'n.
Alan N. Berg, Gen. Atty., Altamonte Springs, for United Telephone Co. of Florida.
James V. Carideo, Vice President-Gen. Counsel and Thomas R. Parker, Associate Gen. Counsel, Tampa, for Gen. Telephone Co. of Fla.
BARKETT, Justice.
We have for review an appeal from Order No. 16804 ("PSC Order"), issued November 4, 1986, by the Public Service Commission ("PSC"). We have jurisdiction. Art. V, § 3(b)(2), Fla. Const.; §§ 350.128 & 364.381, Fla. Stat.(1985). We affirm the order.
This is another in a series of cases arising from the PSC's ongoing effort to restructure *742 intrastate communications following the introduction of competition into long-distance telephone service, both interand intrastate.[1] At issue is whether the PSC may extend beyond a review date of September 1, 1986, an interim policy imposed by prior order[2] and by related licensing restrictions[3] forbidding intrastate long-distance interexchange carriers ("IXCs") such as AT & T from obtaining or building their own access lines linking themselves directly to local customers. In effect, this "bypass restriction" requires the IXCs to purchase access lines from the local exchange companies ("LECs") at rates set artificially high.
The higher rates defray expenses imposed on the LECs by current rate structures in order to advance the "universal service" concept that mandates lower-than-market local phone rates. Universal service rests on a policy that local phone service should be affordable by all who wish it, and thus subsidized from some other source, including long-distance and business service. It is a continuation of a nationwide practice instituted when AT & T held a monopoly on long-distance phone service.
Prior to the 1980s, Florida's intrastate long-distance telephone service was provided entirely by the current LECs or their predecessors, many of which were part of the Bell network owned by AT & T and its subsidiaries. Under a joint agreement, these companies coordinated services and costs among themselves, divided profits, and administered the policy of universal service. The breakup of AT & T's national monopoly and the introduction of competition into intrastate long-distance service by the 1982 legislature made the policy of universal service more problematic. The severance of some of the more lucrative long-distance routes and other regulatory measures created an incentive for bypass that previously had not existed. To forestall this possibility and the concomitant danger to the availability of universal service, the PSC imposed the bypass restrictions that form the basis of this suit.
When the bypass restriction was first imposed, the PSC noticed that it was "only an interim measure" and stated that "an investigation of the bypass and the development of a different rate structure are underway." Fla. PSC Order No. 1309, slip op. at 5-6. The PSC later noted that
this Commission has continuously stated its belief that the continuation of support by the IXCs for universal service will benefit society as a whole and does not detract from the provision of telecommunications services... . In outlining our plan for intrastate access charges for toll use of local exchange company services, we recognized that the bypass of local facilities [by IXCs] is a threat to many LECs in Florida.
PSC Order, slip op. at 4 (citation omitted). Upon reviewing the matter, the PSC decided *743 to continue the bypass restriction because the new rate structures had not yet been developed to better reflect the changed climate created by long-distance competition. The order continuing the bypass is challenged by several IXCs which argue that the PSC's action violates Florida's nondelegation doctrine,[4] improperly interferes in IXC management and is unsupported by substantial competent evidence.
Like all state administrative agencies, the PSC operates under the mandate of the legislature. For the issues in dispute here, the PSC's licensing power arises chiefly from section 364.335(4), Florida Statutes (1985), which provides in pertinent part:
The [PSC] may grant a certificate, in whole or in part or with modifications in the public interest, but in no event granting authority greater than that requested in the application or amendments thereto .. .; or it may deny a certificate. The commission shall not grant a certificate for a proposed telephone company, or for the extension of an existing telephone company, which will be in competition with or duplicate the local exchange services provided by any other telephone company, unless it first determines that the existing facilities are inadequate to meet the reasonable needs of the public and it first amends the certificate of such other telephone company to remove the basis for competition or duplication of services.
(Emphasis added.) Similarly, the PSC's authority to impose restrictive orders and rules derives from section 364.14(2), Florida Statutes (1985):
Whenever the [PSC] finds that the rules, regulations, or practices of any telephone company are unjust or unreasonable, or that the equipment, facilities, or service of any telephone company are inadequate, inefficient, improper, or insufficient, the commission shall determine the just, reasonable, proper, adequate, and efficient rules, regulations, practices, equipment, facilities and service to be thereafter installed, observed, and used and shall fix the same by order or rule as hereinafter provided.
Under the circumstances presented here, we can find no indication that the legislative policy-making function has been usurped by or improperly transferred to the PSC. Indeed, the PSC's actions advance the three fundamental and primary legislative policies relevant to the current dispute. First, the legislature has made a decision that there shall be long-distance competition in Florida. Microtel, Inc. v. Florida Public Service Commission, 464 So.2d 1189, 1191 (Fla. 1985). See § 364.335(4). Second, the legislature has determined that there shall be no similar competition in local phone services, which will continue to be offered on a monopoly basis. § 364.335(4). See U.S. Sprint Communications Co. v. Marks, 509 So.2d 1107, 1109 (Fla. 1987) (consolidated cases). And third, the legislature has obliged the PSC to act in the public interest whenever it permits competition in any aspect of Florida's telecommunications system. § 364.337(2), Fla. Stat. We find nothing in this record to indicate that the orders and restrictions now in dispute are aimed at anything more than fostering these three policies to the fullest extent now possible.
Appellants argue as appellants did in U.S. Sprint and Microtel that, in its construction of these statutes, the PSC has arrogated to itself a "roving commission" to do as it pleases, contrary to Florida's nondelegation doctrine. We rejected that argument in U.S. Sprint and likewise reject it here.
Nor are we persuaded that the PSC improperly has assumed an unlimited authority to define the term "public interest." Section 364.337(2)[5] provides sufficient criteria *744 that must be considered by the PSC in determining the public interest whenever it licenses a phone company to engage in competition. U.S. Sprint at 1109-1110. We find nothing in the present case to suggest that these criteria have been subverted or are somehow so vague as to constitute an unlawful delegation of legislative power.
Finally, we are unpersuaded that the interim bypass restriction is so contrary to the ultimate goal of intrastate long-distance competition as to undermine the legislature's primary and fundamental policy decision. We previously have rejected claims that chapter 82-51, Laws of Florida (1982), required the sudden and unconditional injection of competition into all long-distance service, without regard to the chaos that thereby might ensue. U.S. Sprint, at 1110. We similarly hold that no such requirement rests upon the PSC in the current dispute. The new competitive policy in no sense obligates the PSC to abolish instantaneously all existing rate structures and access systems without a thought as to the consequences.
To the contrary, it is incumbent upon the PSC to act in a manner likely to achieve the goals of Florida's telecommunications policy to the fullest extent possible. Under current rate structures, a sudden introduction of competition in every imaginable aspect of long-distance service clearly would be inconsistent both with the public interest and the integrity of local phone companies. See U.S. Sprint, at 1110. The PSC has discretion to take interim measures designed to harmonize to the greatest extent the three goals of the new telecommunications policy wherever they are found to be temporarily inconsistent.
We caution, however, that our decision is predicated on accepting at face value the commission's own characterization of the bypass restriction as a "temporary" or "interim" measure:
Recognizing that this access plan would require time to implement and refine, we imposed the bypass restriction as an interim step to protect the LECs during the transition [to competition].
... .
[W]e find it appropriate to retain the bypass restriction until we implement an appropriate rate structure for the recovery of [non-traffic sensitive] costs from IXCs and end users.
PSC Order, slip op. at 4-5 (emphasis added).
Thus, we do not reach the issue of whether local access lines for long-distance service constitute a "local exchange service" within the meaning of section 364.335(4), a position urged by counsel for the PSC. Our decision today is premised entirely on our conclusion that, during the transition to long-distance competition, the PSC has authority to take interim measures in the public interest even if those measures temporarily maintain some vestiges of the prior monopoly long-distance system. See U.S. Sprint.
Appellants' two remaining arguments warrant little discussion. We reject appellants' contention that the bypass restrictions constitute an unlawful interference with management prerogatives of the IXCs. Interference with this kind of management "prerogative," so long as it is pursuant to properly delegated authority, clearly falls within the regulatory power of the PSC. It is only when the PSC acts without authority, or when it interferes in the purely internal managerial affairs of a company, that this issue may have merit.
Similarly, we reject appellants' argument that the PSC order below was not supported by substantial competent evidence. Appellants essentially ask us to reweigh the evidence on appeal, giving greater credence to their own experts than those of their opponents. While we agree that there is a marked conflict in the testimony *745 of the witnesses, we find sufficient competent evidence in the record to support the PSC's findings, which we therefore may not disturb. Surf Coast Tours, Inc. v. Florida Public Service Commission, 385 So.2d 1353 (Fla. 1980); Kimball v. Hawkins, 364 So.2d 463 (Fla. 1978).
Accordingly, Order No. 16804 of the Public Service Commission is hereby affirmed.
It is so ordered.
McDONALD, C.J., and OVERTON, EHRLICH, GRIMES and KOGAN, JJ., concur.
SHAW, J., dissents with an opinion.
SHAW, Justice, dissenting.
In Microtel, Inc. v. Florida Public Service Commission, 464 So.2d 1189, 1191 (Fla. 1985) (Microtel I), we concluded that the legislature had "made the `fundamental and primary policy decision' that there be competition in long distance telephone service" and upheld a Public Service Commission (PSC) order denying Microtel, Inc. an interexchange carrier (IXC), a claimed right to be protected from competition until it had a reasonable time to establish itself in the long distance marketplace. Id. Nevertheless, in Microtel, Inc. v. Florida Public Service Commission, 483 So.2d 415 (Fla. 1986) (Microtel II), and Microtel, Inc. v. Marks, 509 So.2d 1107 (Fla. 1987) (Microtel III), we upheld the authority of PSC to establish Toll Monopoly Areas (TMAs) for Local Exchange Companies (LECs) on an interim basis. We reasoned that TMAs were (1) limited in scope to Equal Access Exchange Areas (EAEAs),[1] (2) interim in that they were limited in time, and (3) a transitory measure enroute to full competition in long distance (toll) service. Microtel I-III indicate that this Court is prepared to give the PSC great leeway in managing the transition from monopolistic to competitive long distance service provided there is statutory authority for the PSC action. I have no quarrel with this basic proposition but my review of this case indicates that the bypass prohibition is neither transitory nor is it authorized by the legislature.
Before reaching the legal issues, it is necessary to review the record in this case and the recent history of long distance service in the nation and Florida. The decision to introduce competition into long distance service derives primarily from the Modified Final Judgment (MFJ) entered in the American Telephone and Telegraph Company (AT & T) divesture action.[2] As it pertains here, the MFJ divided Florida into seven Local Access and Transport Areas (LATAs) and three market areas. The MFJ mandates that there be competition in long distance service between LATAs. Access charges for inter-state calls are regulated by the Federal Communications Commission (FCC) while access charges for intra-state calls are regulated by the PSC.[3] The FCC places the access charge on the end user, PSC on the interexchange carrier (IXC). The FCC charges are on the order of six cents per minute; PSC charges are on the order of eleven to twelve cents per minute. One expert witness for an LEC (Southern Bell) estimated that the true cost of access was in the range of four to six cents. The FCC does not prohibit bypass of LEC facilities; the PSC prohibits such bypass by IXCs. The PSC sets long distance access charges on intra-state calls at an artificially high rate based on its policy decision that long distance service should *746 subsidize local service. The purported aim of this subsidy is to reduce local rates and thereby promote universal service.
The record here shows that testimony and arguments were received from representatives of LECs, IXCs, and resellers of telephone services. There was remarkable agreement and only one significant disagreement between the parties. All agreed that the PSC bypass prohibition policy was a failure which had encouraged bypass of LECs by high volume customers and that the real problem was not bypass but the excessive access charges mandated by PSC. The only significant disagreement was whether the bypass prohibition policy should be rescinded immediately, the IXC position, or should be held in place until PSC approved realistic and competitive access charges, the LEC position. To understand why the parties agreed on the failure of the policy, it is necessary to examine the practical characteristics and results of the policy. First, the prohibition does not apply to customers, only to regulated IXCs. High volume customers have found it economically desirable to bypass LEC switching facilities by (a) installing their own access lines to the IXCs, (b) renting special access (private) lines from the LECs and bypassing the switched, common user, facilities of the LECs, or (c) purchasing or leasing independent communication systems from unregulated telecommunications companies. It is doubtful that any of these three methods of customer bypass would be economically viable if LEC switched access facilities were realistically priced at fair market value. It should be noted that (b) involves greater expense with less return for the LEC and that the LECs are in effect bypassing their own switched access facilities which are, purportedly, the facilities which are intended to be protected by the prohibition. It should also be noted that customers bypassing under (c) are lost to both LECs and IXCs and are unlikely to be regained. Second, the FCC does not prohibit bypass on inter-state access. Customers or IXCs may establish direct access for inter-state service and then use the access for both inter and intra-state calls.
It can be seen from the above that the practical effect of PSC bypass prohibition and subsidization policy is to drive the most lucrative customers, large businesses, away from the switched access facilities and to place both the LECs and IXCs at a competitive disadvantage with unregulated telecommunication companies and resellers of telephone services. The record is clear that IXCs prefer to use switched access facilities of LECs, provided access is realistically priced at a fair market price. It is also clear from the record that LECs are capable of offering competitive access prices and wish to do so. Thus, as the parties agree, the real problem is the attempt by PSC to pursue a policy of subsidization by regulatory fiat, contrary to market forces and the scope of PSC regulatory authority. Because of the gap in PSC authority, the most lucrative source of income, high volume users, are able to avoid the PSC policy of subsidization, albeit at a cost above that of realistically priced switched access facilities. This leaves the burden of subsidization to fall on those captive customers whose volume of long distance calls does not justify bypass of LEC switched access, i.e., residential customers and small businesses. Inasmuch as these captive long distance customers are for the most part the same customers the subsidy is intended to benefit, a substantial question is raised as to whether the public interest is served by a regulatory policy under which the LECs, the IXCs, high volume users, and low volume users all suffer. Because I find that PSC has no statutory authority to establish such a policy, there is no need to answer that question.
In upholding the bypass restriction, the majority finds that the PSC actions advance three fundamental and primary legislative policies: (1) that there be long distance competition in Florida; (2) that there be no competition in local service and that such service continue to be offered on a monopoly basis; and (3) that the PSC shall act in the public interest. I do not agree with any of these conclusions. On the first point, the LECs have in place local exchange facilities required for local service which have historically been used for long *747 distance access. The LECs are clearly in a superior position to immediately compete in the long distance access market and have been so from the beginning. Moreover, the record shows that the IXCs regard the LECs as the preferred choice for long distance access; they have no desire or interest in bypassing the LEC exchange facilities provided access rates are set at a fair market price. Further, the record shows that the LECs prefer to rely on their superior competitive position in the market, presumably because market superiority is a more reliable advantage than regulatory fiat which the record shows is producing results contrary to the best interest of the LECs. The solution is obvious, PSC should abandon its anti-competitive and counter productive measures which are contrary to the legislative decision that there be competition with a minimum of regulation.[4] The LECs superior competitive position and market forces will solve this problem if PSC will permit them to do so.
On the second point, the majority's conclusion that the PSC order supports the legislative decision that local services will be offered on a monopoly basis is grounded on the disputed assumption that access to long distance service is a local service. I do not agree that this is true and note that the majority explicitly states that it does not reach the issue of whether local access lines constitute local exchange service within the meaning of section 364.335(4), Florida Statutes (1983). I believe that the better reading of "local exchange," which was inserted by chapter 82-51, section 3, Laws of Florida, in order to place long distance service on a competitive basis, is that it encompasses local telephone calls, not access to long distance service. There is no doubt that the legislature intended that there be competition in long distance service. This clear intention should not be frustrated by a reading which imposes a monopoly on an irreplaceable component of long distance service  access.[5] I note also that the PSC order permits bypass if the LEC fails to demonstrate that it can provide access at a lower cost and in a more timely manner than an IXC bypass. If access to long distance service is truly a monopolistic local exchange service, as PSC maintains, this bypass provision would be contrary to section 364.335(4) which prohibits duplication unless local exchange facilities are inadequate. There is no suggestion that LEC access facilities are inadequate, only that they are unfairly priced.
On the third point, the majority concludes that PSC is authorized to prohibit *748 bypass based on its general authority to act in the public interest. To understand this issue, we need to clearly understand the underlying PSC policy. The PSC has made a basic decision, purportedly in the public interest, that it may institute policies designed to require that long distance customers subsidize local exchange customers. In short, the PSC is establishing a rate system based on the deep pocket principle of a progressive income tax. I have some doubt that regulatory policies should be based on such principles, but that is a legislative question. The issue for this Court is whether chapter 364 contains any authorization for PSC to make such a decision. I cannot find any statutory provisions which support the PSC position. There are provisions, however, which are contrary to the PSC position. Sections 364.03(1) and 364.035(1) require that rates be fair, just, reasonable, sufficient, and compensatory. Section 364.10 prohibits undue or unreasonable preference or advantage to any person in any respect whatsoever. Section 364.14 prohibits rates which are unjust, unreasonable, unjustly discriminatory or unduly preferential and mandates that, in prescribing rates, the commission shall allow a fair and reasonable return. The thrust of these sections is that rates will be nondiscriminatory, based on the legitimate costs of providing the service plus a fair and reasonable return on the investment. I do not believe this thrust is compatible with setting rates arbitrarily and discriminatively in order to benefit one group of customers to the detriment of another.
The majority states that it accepts at face value the commission's characterization of the bypass restriction as "temporary" or "interim" and premises its decision entirely on the transitory nature of the measure. This warning of impatience may prod PSC into setting access rates at a competitive fair market level which will obviate the need for the coercive bypass prohibition. However, this so-called temporary measure has been in effect since 1983. Moreover, in response to questioning at oral argument, counsel for PSC conceded that this was not in fact a temporary measure. Inasmuch as the bypass prohibition is a necessary corollary to the current excessive access rates, it appears that counsel was simply being candid with the Court. Common sense says that IXCs and their customers will not pay an excessive price for access services unless they are coerced by a bypass prohibition or some equivalent measure.[6] In my view, four years is sufficient time to accomplish the mundane regulatory task of setting access rates at a profitable but competitive level. I would reverse the order below and direct that the bypass prohibition be immediately rescinded.
NOTES
[1] Competition was introduced in the federal jurisdiction by entry of the judgment in United States v. American Telephone & Telegraph Co., 552 F. Supp. 131 (D.D.C. 1982), aff'd sub nom, Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), modified sub nom, United States v. Western Electric Co., 569 F. Supp. 990 (D.D.C.), further modified, United States v. Western Electric Co., 569 F. Supp. 1057 (D.D.C.), aff'd sub nom, California v. United States, 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983). In apparent anticipation of that decision, the 1982 Florida Legislature enacted chapter 82-51, section 3, Laws of Florida (1982), authorizing the PSC to permit competition in all intrastate long-distance phone service, though not in local service. See § 364.335, Fla. Stat. (1985).
[2] Order No. 12765, Fla. Public Service Commission (Dec. 9, 1983). This order, in turn, was the culmination of an earlier decision to implement new access charges pursuant to the introduction of competition into intrastate long-distance phone service. Order No. 11551, Fla. Public Service Commission (Jan. 26, 1983). The review date of September 1, 1986, was set by the PSC to review the interim policy in question and decide whether it should be extended or modified.
[3] The PSC has inserted provisions in all IXC certificates forbidding them to engage in "bypass," such as by building their own local access lines. This licensing restriction was not explicitly raised in the PSC Order now on appeal, which technically addressed only continuation of the bypass restriction imposed by prior final agency action. PSC Order, at 4 (continuing a restriction imposed by Order No. 12765, Fla. Public Service Commission (Dec. 9, 1983)).
[4] See art. II, § 3, Fla. Const. The nondelegation doctrine forbids administrative agencies from exercising powers essentially legislative in nature, such as policy making.
[5] This section provides in pertinent part:

In determining ... the public interest, the [PSC] shall consider:
(a) The number of firms providing the service;
(b) The geographic availability of the service from other firms;
(c) The quality of service available from alternative suppliers;
(d) The effect on telephone service rates charged to customers of other companies; and
(e) Any other factors that the [PSC] considers relevant to the public interest.
[1] Florida geographically is divided into twenty-two EAEAs. Because of the relatively short distances and small tolls involved, the effect of TMAs on long distance competition is comparatively minor for a transition period.
[2] United States v. American Telephone and Telegraph Co., 552 F. Supp. 131 (D.D.C. 1982), aff'd sub nom. Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), as subsequently modified by United States v. Western Electric Co., 569 F. Supp. 990 (D.D.C. 1983) (Western Electric I), and United States v. Western Electric Co., 569 F. Supp. 1057 (D.D.C.), aff'd sub nom, California v. United States, 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983) (Western Electric II). The court continues to hold the case open and, from time to time, enters additional modifications to the judgment.
[3] Logically, because inter-LATA service is regulated by the FCC, it would appear more rational for the FCC to set access charges on all inter-LATA calls regardless of whether they are inter or intra-state.
[4] It should be noted that the FCC follows a contrary policy in the national market and that none of the witnesses could identify any other state jurisdiction which had a bypass prohibition such as PSCs.
[5] The federal district court MFJ mandates that there be inter-LATA competition on long distance service which includes intra-state calls from one LATA to another within Florida. The artifically high access rates set by PSC for inter-LATA calls tends to frustrate the federal policy also by granting LECs and PSC a monopolistic power over long distance access lines. It was such monopolistic power by local operating companies of AT & T which led to the AT & T divestiture under federal anti-trust laws. In United States v. Western Electric Co., 583 F. Supp. 1257 (D.D.C. 1984), the court rejected the proposition that either an LEC or a state regulatory authority could frustrate long distance competition in words that appear relevant to anticompetitive access charges and bypass prohibition.

The refusal of bottleneck monopolies [LECs] to provide the necessary connections potentially stifles competition, and for that reason alone it cannot be said to be in the public interest. As the Airport Operators Council International correctly points out, if Pacific Bell is not required to provide access, the result could be inter alia, to emasculate the growth of competitive interexchange facilities at airports; to hold back the development of innovative long distance telephone facilities and service; and otherwise to deprive the public of benefits. Memorandum at 2.
It is contended by some that the proliferation of exclusive access telephones would be confusing to the public and would for that reason not be in the public interest. There is no doubt that some find confusion in the mushrooming of service and equipment options that have become available in the wake of divestiture; others may regard such proliferation as healthy in that they give the consumer greater choice at potentially lower prices. In any event, that policy dispute, too, is resolved by the antitrust laws and the decree.
Id. at 1260 (footnote omitted).
[6] Because the LECs are able to provide access using existing facilities, they are in the advantageous position of being able to equal or undercut market prices of competitors who have to install facilities for use solely for access. The LECs can provide competitive prices and still receive a profit margin above that of their competitors. In other words, a subsidy for local service can still be obtained using the market itself. This is not unfair or anti-competitive because the increased profit level results from the more efficient use of LEC facilities, i.e. the economy of scale obtained when existing but underutilized facilities are placed into fuller production.