PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 11, 2001
THOMAS K. KAHN
CLERK

_____

No. 00-16459
_____

D. C. Docket No. 97-00262-CV-4-RH

AT&T COMMUNICATIONS OF THE SOUTHERN STATES, INC.,

Plaintiff-Counter-Defendant-Cross-
Claimant-Appellee,

versus

BELLSOUTH TELECOMMUNICATIONS, INC.,

Defendant-Counter-Claimant-Counter-
Defendant-Appellant,

FLORIDA PUBLIC SERVICE COMMISSION and
COMMISSIONERS OF THE FLORIDA PUBLIC SERVICE
COMMISSION, in their official capacities,

Defendants-Cross-Defendants-
Appellants.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(October 11, 2001)**

Before EDMONDSON, BIRCH  and WILSON, Circuit Judges.

BIRCH, Circuit Judge:

This appeal requires us to address whether, under the Telecommunications Act of 1996, an incumbent local exchange carrier must exclude its operator services from its local telephone services package offered to new market entrants for resale.  Because we disagree with the district court's determination that an incumbent carrier does have to exclude operator services from its complete services package made available for resale, we REVERSE.

## I.  BACKGROUND

Congress enacted the Telecommunications Act of 1996 (the "Act")[1] to instigate competition in local and long distance telephone markets by "lifting the shackles of monopoly regulation."  H.R. Rep. No. 104-204, at 48 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 11.  Accordingly, the Act imposes certain duties upon incumbent local exchange carriers.  These carriers who historically had a monopoly over local markets because they owned the physical networks needed in supplying telecommunication services.  Of particular importance to this appeal is the "resale" duty, which requires incumbents to provide their complete retail package of services to prospective entrants in the intrastate telephone market.  47

---

[1]Pub. L. No. 104-104, 110 Stat. 56 (1996) (codified in scattered sections of 47 U.S.C.).

U.S.C. § 251(c)(4) (Supp. V 1999). Entrants then can compete with incumbents by reselling these services to their own customers. Id.

To effectuate their resale and other enumerated duties under the Act, incumbents must negotiate interconnection agreements with prospective market entrants. § 252. Incumbent carriers and new entrants are first to enter into good faith negotiations to detail the terms for such interconnection. § 252(a). Should the parties fail to reach agreement on all terms, the Act provides for binding arbitration before the relevant state public service commission. § 252(b)-(c). Once the state commission approves the arbitration agreement, an aggrieved party may bring an action in district court "to determine whether the agreement . . . meets the requirements" of the Act. § 252(e)(6).

Appellant, BellSouth Telecommunications, Inc., ("BellSouth"), is an incumbent carrier in the Florida intrastate telephone market, and Appellee, AT&T Communications of the Southern States, Inc., ("AT&T"), is a prospective entrant into that market. Pursuant to the 1996 Act, BellSouth and AT&T began negotiations over an interconnection agreement, but the parties could not agree on all terms, including the particular services BellSouth would offer to AT&T for resale. As a result, AT&T and BellSouth entered into binding arbitration before the Florida Public Service Commission (the "Commission" or "FPSC"). The

3

Commission concluded, among other things, that if AT&T wanted to purchase BellSouth's local telephone services for resale, it would have to purchase BellSouth's operator services, which were part of the basic package of telephone services BellSouth offered to its own retail customers.

Unsatisfied with the FPSC's conclusions, AT&T commenced this action under § 252(e)(6) against BellSouth, the FPSC, and the FPSC commissioners in their official capacities in the Northern District of Florida. The district court reversed the FPSC on the operator services issue based on its interpretation of the 1996 Act and on accompanying Federal Communication Commission ("FCC") regulations. The district court concluded that BellSouth had to eliminate its operator services from its services package offered to AT&T for resale. Upon entry of judgment, BellSouth, the FPSC, and the FPSC commissioners sought review from this court on the limited question of whether the district court erred with regard to the operator services issue.

## II. DISCUSSION

A. The Standard of Review

Whether the 1996 Act and accompanying FCC regulations require operator services to be eliminated from an incumbent's local telephone services package offered to new entrants for resale is a purely legal question. Consequently, we

4

review <u>de novo</u> the district court's determinations on this issue. <u>United States v. Plummer</u>, 221 F.3d 1298, 1302 (11th Cir. 2000).

B. <u>The Telecommunications Statutory Landscape</u>

Historically, states exclusively regulated intrastate telephone service, and the FCC generally lacked jurisdiction over such service. <u>See</u> 47 U.S.C. § 152(b)(1). States like Florida treated local telephone service networks as natural monopolies and granted certain exchange carriers exclusive franchises for providing local services. As the FCC explains, "[i]n the old regulatory regime government encouraged monopolies. . . . State and federal regulators devoted their efforts over many decades to regulating the prices and practices of . . . [telecommunications] monopolies and protecting them against competitive entry."[2]

In return for an exclusive franchise, Florida local carriers had their telephone rates regulated and were required to provide "universal service,"[3] which "mandates

---

[2] First Report and Order, <u>In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996</u>, 11 F.C.C.R. 15499, 15505, ¶ 1 (1996) ("First Report and Order"), <u>aff'd in part, vacated in part</u>, <u>Iowa Utils. Bd. v. FCC</u>, 120 F.3d 753 (8th Cir. 1997), <u>aff'd in part, rev'd in part</u>, <u>AT&T Corp. v. Iowa Utils. Bd.</u>, 525 U.S. 366, 119 S. Ct. 721 (1999).

[3] "[T]he term 'universal service' means an evolving level of access to telecommunications services that, taking into account advances in technologies, services, and market demand for essential services, the commission determines should be provided at just, reasonable, and affordable rates to customers, including those in rural, economically disadvantaged, and high-cost areas." 13B Fla. Stat. Ann. § 364.025(1) (1999). For a concise history of state implementation of universal service mechanisms prior to the Act, <u>see</u> Peter W. Huber et al., <u>Federal Telecommunications Law</u> § 6.2 (2d ed. 1999).

lower-than-market local phone rates" based on the "policy that local phone service should be affordable by all who wish it" and "subsidized from some other source, including long-distance and business service." See AT&T Communications of the Southern States, Inc. v. Marks, 515 So.2d 741, 742 (Fla. 1987). Florida implemented its universal service framework through "tariff" agreements instituted between the FPSC and local carriers.[4] Under this tariff regime, monopoly carriers were to provide affordable local telephone service to residential customers where the expense would otherwise create economic discentives to providing service. This rate / subsidy framework ensured that affordable telephone service was available in all locales throughout the state.

The telecommunications structure premised on exclusive franchises and subsidized local services began to undergo rapid change in the 1990s. The goals of the Act included opening local telephone markets to competition and eliminating the exclusive franchise system. See 47 U.S.C. § 253(a). The Act aimed "to shift monopoly markets to competition as quickly as possible." H.R. Rep. No. 104-204, at 89, reprinted in 1996 U.S.C.C.A.N. at 55. In lieu of exclusive local carriers, the

---

[4] "A 'tariff' is a public document setting forth the services of the [telecommunications] carrier being offered, the rates and charges with respect to the services and the governing rules, regulations and practices relating to those services." International Tel. & Tel. Corp. v. United Tel. Co. of Fla., 433 F. Supp. 352, 357 n.4 (M.D. Fla. 1975).

Act institutes a regulatory framework that encourages new entrants to enter local markets. To facilitate new entry, the Act provides three distinct entry paths for potential competitors. First, the new entrant can build new network facilities to compete with the facilities already owned by incumbent local carriers. AT&T, 525 U.S. at 371-73 & n.1, 119 S. Ct. at 726-27 & n.1. Second, it can buy access to network elements owned by incumbents on an unbundled basis by purchasing access to individual pieces of an incumbent's telecommunications network, such as local loops and local switching devices, that can then be used by the entrant to offer competing local services. 47 U.S.C. § 251(c)(3) (unbundled access provision). Third, it can buy retail telephone services offered by incumbents and then resell these services to its own customers. § 251(c)(4) (resale provision). Because the unbundled access provision and resale provision are particularly significant to this case, we will discuss each in turn.

Under the unbundled access provision, incumbent carriers have "[t]he duty to provide[] to . . . [new entrants] nondiscriminatory access to network elements on an unbundled basis at any technically feasible point." § 251(c)(3). "[N]etwork element[s]" are defined broadly to include any "facility or equipment used in the provision of a telecommunications service," as well as "features, functions, and capabilities provided" by any "facility or equipment." § 153(29). Unbundled

7

access "permit[s] new entrants to offer competing local services by purchasing from incumbents *at cost-base prices*, access to elements which they do not already possess, unbundled from those elements that they do not need." 11 F.C.C.R. at 15617-18, ¶ 231 (emphasis added). To use a simple analogy, the unbundled access provision is akin to requiring one car manufacturer to sell a competitor access not to one of its completed vehicles, but to the individual elements of the vehicle, such as the engine, radiator, and tires, all of which the manufacturer has unbundled, or segregated out, for the competitor's convenience.

Additionally, the Act provides a distinct pricing mechanism for purchase of network elements from incumbents. New entrants are to obtain access to these elements at "rates, terms, and conditions that are just, reasonable, and nondiscriminatory." § 251(c)(3). In turn, these rates are to be "based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing" network elements and "may include a reasonable profit." § 252(d)(1)(A)(1) & (B).

The resale provision creates a separate set of duties for incumbents. Incumbent carriers must "offer for resale *at wholesale rates* any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers. § 251(c)(4)(A) (emphasis added). To continue

our previous analogy, the resale provision is akin to requiring the car manufacturer only to provide its competitor access to the completed vehicle itself without permitting separate, unbundled purchase of individual vehicle parts.

Congress also provided a completely separate and distinct pricing methodology for the resale provision. This methodology provides that incumbent carriers are to recoup the full retail rate they currently charge customers for complete telephone services minus "any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier" in selling at wholesale to a new entrant. § 252(d)(3). Thus, unlike the pricing rule for the unbundled access provision, the resale pricing rule begins with the current retail rate as the proper baseline for calculation, not with cost.

The Act and its introduction of these new entry paths into local telecommunications markets revolutionized the telecommunications industry. The Act's implementation, however, continues to operate against a backdrop of state tariff arrangements and universal service mechanisms that create a potential "patchwork quilt" of state subsidies "intended to promote telephone subscribership." 11 F.C.C.R. at 15506, ¶ 5. Indeed, although Congress intended for the Act to facilitate competition, at the same time it specifically codified its commitment to universal service mechanisms. See 47 U.S.C. § 254. The Act itself

contemplates a federal-state partnership to sustain universal service. See §

254(b)(5) ("There should be specific, predictable and sufficient Federal and State

mechanisms to preserve and advance universal service."); § 254(f) ("Every

telecommunications carrier that provides intrastate communications services shall

contribute . . . in a manner determined by the State to the preservation and

advancement of universal service in that State."). Thus, even in the present

deregulatory climate, states still play a major role in implementing tariff

agreements that ensure universal service in intrastate telephone markets.

Like other states, Florida continues in its commitment to universal service.

See 13B Fla. Stat. Ann. § 364.025(1) ("It is the intent of the Legislature that

universal service objectives be maintained after the local exchange market is

opened to competitively provided services."). Consequently, Florida law requires

that "[f]or a period of 8 years after January 1, 1996, each local exchange

telecommunications company . . . furnish basic local exchange telecommunications

service within a reasonable time period to any person requesting such service

within the company's service territory." Id. "Basic local telecommunications

service" includes, among other things, 911 emergency services, directory

assistance, and *operator services*. § 364.02(2) (emphasis added). Moreover,

telecommunications carriers still must file tariff schedules detailing the rates

10

charged for service and the carriers' service obligations with the FPSC. See §

364.04;[5] 25 Fla. Admin. Code Ann. r. 25-4.034(1).[6] Local telephone rates also

remain subject to FPSC oversight.[7]

In sum, although the Act fosters competition, the Act continues to operate in

a Florida telecommunications landscape affected by a history of universal service

implemented through required tariff filings. This clash between the Act and

traditional state pricing regimes can distort competition. As the FCC has noted,

"[s]ome policies that traditionally have been justified on universal service

considerations place competitors at a disadvantage. Other universal service

---

[5] Section 364.04(1) provides: "Upon order of the commission, every telecommunications company shall file with the commission, and shall print and keep open to public inspection, schedules showing the rates, tolls, rentals, contracts, and charges of that company for service to be performed within the state."

[6] 25 Fla. Admin. Code Ann. r. 25-4.034(1) provides in part: "Each telecommunications company shall maintain on file with the Commission tariffs which set forth all rates and charges for customer services, the classes and grades of service available to subscribers, the conditions and circumstances under which service will be furnished, and all general rules and regulations governing the relation of customer and utility."

[7] Florida local exchange carriers can opt for regulation under FPSC "price cap" rules pursuant to § 364.051 or continue under "rate-of-return" rules and other requirements associated therewith pursuant to §§ 364.03 (reasonableness of rates, performance of service, and maintenance of facilities), 364.035 (rate fixing), 364.037 (telephone directory advertising revenues), 364.05 (changes in rates), 364.055 (interim rates), 364.14 (readjustment of rates), 364.17 (required reports, accounts, records and memoranda), and 364.18 (inspection of accounts and records). For a discussion differentiating "price cap" and "rate-of-return" regulatory methodologies, see Federal Telecommunications Law § 2.2.3.

policies place the incumbent . . . at a competitive disadvantage." 11 F.C.C.R. at 15506, ¶ 5.

This distortion is particularly cogent when a new entrant gains access to an incumbent's retail services package under the Act's resale provision. For instance, new entrants can target for purchase an incumbent's retail services in Florida markets where the incumbent historically has charged above-cost rates because of universal service objectives. Then the entrant can resale those services at a rate that undercuts the incumbent's artificially high rates. While good for certain consumers, this entry strategy undercuts the incumbent's ability to subsidize and recover its historical investments in markets where universal service commitments led to below-cost pricing.

Conversely, new entrants can use the resale provision to take advantage of artificially low prices in Florida markets where service traditionally has been subsidized. Because the resale pricing rule uses retail rates as the baseline for determining the compensation owed to incumbents, entrants can purchase from incumbents those complete services offered in markets where retail prices are artificially low because of the historical subsidy system. Thus, the new entrant potentially can use the resale pricing mechanism to obtain a cost advantage over an incumbent in markets where retail prices are lower than they otherwise would be

absent Florida's traditional commitment to universal service as reflected in the FPSC set tariff.

C.  Operator Services Relevant to this Case

Against this statutory backdrop, the district court interpreted the Act's resale provision to require the incumbent carrier, BellSouth, to eliminate operator services from its retail telephone services package offered to the new entrant, AT&T, for resale.  AT&T Communications of the Southern States, Inc. v. BellSouth Telecommunications, Inc., 122 F. Supp. 2d 1305, 1314-16 (N.D. Fla. 2000) ("AT&T Communications").  The court concluded that the FPSC erred by failing to require BellSouth to exclude the cost of such services from the price charged to AT&T for access to BellSouth's complete services package.  Id.

The district court reached this conclusion for two reasons.  First, the court determined that operator services constitute "other costs" under 47 U.S.C. § 252(d)(3) and consequently should be eliminated from BellSouth's complete services package offered to AT&T for resale.  Id. at 1315.  Second, the court relied on two FCC customized routing provisions, 47 C.F.R. § 51.319(c)(1)(iii)(B) and 11 F.C.C.R. at 15772-73, ¶ 536, as a basis for requiring BellSouth to eliminate operator services from its resold services package.  Id.  We reject the district court's reasoning.

13

1. "Other Costs" under 47 U.S.C. § 252(d)(3)

The district court premised its decision in part on its finding that operator services are "other costs" under 47 U.S.C. § 252(d)(3), the pricing rule for the resale provision. AT&T Communications, 122 F. Supp. 2d at 1315. Section 252(d)(3) provides that "marketing, billing, collection, and *other costs that will be avoided*" by the incumbent should be eliminated from the price of retail services offered to new entrants for resale. (emphasis added). The court analogized operator services costs to billing costs and concluded that, like the latter, the former are costs that BellSouth can avoid when it offers its services at wholesale to AT&T rather than at retail to consumers. Id. at 1315. This conclusion is untenable for several reasons.

Of primary importance is the district court's failure to interpret the Act's resale provision in light of the backdrop of historical state universal service commitments and accompanying tariff filing requirements. We have explained that traditional state universal service objectives can distort competition and offer competitive advantages to new entrants like AT&T who strategically use the resale provision. AT&T can purchase access to BellSouth services offered in markets where rates are artificially high because of a history of subsidized universal service, and then AT&T can resell those services at a reduced rate. Thus, AT&T

14

can undercut BellSouth's ability to use an above-cost pricing structure to recover historical investments in other Florida markets where services have been offered at rates below-cost. Conversely, AT&T can obtain the benefits of Florida's traditional universal service framework by using the Act's resale provisions to acquire access to BellSouth's services offered in markets where the retail rate is artificially low because of a history of subsidy arrangements. Therefore, AT&T can obtain potential cost advantages over BellSouth.

AT&T's strategy in this case suggests that it plans to use the Act's resale provisions to exploit these advantages. Regarding the operator services issue, AT&T has insisted on proceeding under the resale provision and its retail rate pricing methodology. AT&T proceeds in this manner despite the fact that BellSouth concedes that if AT&T proceeded under the unbundled access provision, BellSouth would have to exclude operator services facilities from other network elements offered to AT&T for resale. AT&T's refusal to so proceed suggests that the company is taking advantage of competitive distortions caused by Florida's history of universal service and accompanying tariff regimes.

Although AT&T is attentive to how artificial prices caused by a history of universal service in Florida can accrue to its benefit under the resale provision, AT&T simultaneously ignores this framework whenever it might suggest a need

15

for constrictions on its entry path. Thus, in AT&T's argument over whether operator services constitute "other costs" under § 252(d)(3), the history of universal service in Florida goes unmentioned. We find that just the opposite should be the case. The meaning of "other costs" should be historically contextualized and read in view of the costs imposed on local carriers because of a history in Florida of universal service and an accompanying tariff regime. Otherwise, new entrants like AT&T can benefit from traditional state subsidy arrangements while ignoring the costs they impose on BellSouth and other local carriers. Such a result would conflict with the Act's commitment to ensuring that incumbents receive fair compensation for providing access to their services for resale. See 47 U.S.C. § 252.

Consequently, in determining whether operator services constitute "other costs" under § 252(d)(3), we must consider BellSouth's universal service commitments under Florida law. As part of Florida's commitment to universal service, each local carrier in Florida is required to provide basic local telephone service within a reasonable time to anyone who requests it within the carrier's service area for an eight-year period after January 1, 1996. 13B Fla. Stat. Ann. § 364.025(1). Basic local phone service includes operator services. § 364.02(2). At oral argument, counsel for BellSouth stated that BellSouth's tariff agreement

16

requires it to provide operator services in Florida. That operator services are a required element of BellSouth's local telephone services package indicates that such services are not mere costs akin to "marketing, billing, [and] collection" under 47 U.S.C. § 252(d)(3). It instead suggests that operator services are an essential component to BellSouth's local service, inextricably interwoven with the proper transmission of telephone communications, not a cost rightly viewed as avoidable or ancillary to basic telephone service. Section 364.02(2) also states that Florida considers operator services a necessity, an integral service conducive to the smooth operation of a carrier's telecommunication platform. It follows that the district court erred in conflating operator services with more peripheral costs like marketing, billing and collection by requiring BellSouth to extricate operator services from its complete services package made available to AT&T for resale.

Apart from our decision based on the tradition of universal service in Florida, we conclude that the district court misinterpreted § 252(d)(3) for two additional reasons. The first is based on a proper interpretation of that section according to the principle that "general terms following a series of more specifically enumerated terms refer to items similar in structure and function to the enumerated terms." United States v. Sepulveda, 115 F.3d 882, 886 n.8 (11th Cir. 1997). In view of this principle, the specifically enumerated terms under §

17

252(d)(3)—marketing, billing, and collection—should encompass the scope of what constitutes "other costs." That is, "other costs" should be read as referencing activities "similar in structure and function," Sepulveda 115 F.3d at 886 n.8, to the three specific activities listed. Marketing, billing, and collection are activities that center on the promotion of telephone services and on generating and collecting revenue from such services. Operator services are not similar in structure or function to promotional or revenue-related activities; such services instead are activities that shore up the smooth operation and transmission of telecommunications over the service network. It follows that operator services cannot be deemed "other costs" under § 252(d)(3).

We also disagree with the district court because, in interpreting § 252(d)(3), the court improperly focused on the resold services package the new entrant, AT&T, wanted to offer to its own customers, not on the services package offered by the incumbent, BellSouth, to its current retail customers. The district court observed that operator services generate costs akin to billing because "[b]oth are features that a *reseller* might reasonably choose to provide for itself." AT&T Communications, 122 F. Supp. 2d at 1315(emphasis added). Section 253(d)(3), however, states that "other costs" include only those "that will be avoided by the *local exchange carrier*," here BellSouth. (emphasis added.) As the FCC has

explained, other costs are "those that an incumbent . . . would no longer incur if it were to cease retail operations and instead provide all of its services through resellers." 11 F.C.C.R. at 15956, ¶ 911.[8]  Thus, the standard for what constitutes "other costs" is the services package offered by the incumbent to its current retail customers, irrespective of the services package the new entrant wants to offer to its own customers when it resells incumbent's services.  It is undisputed that BellSouth offers operator services as part of its basic services package to retail customers.  Whether AT&T wants to offer its own operator services to prospective customers does not change this fact.  The district court therefore erred in its interpretation of § 252(d)(3) by focusing on AT&T's desire to offer its own operator services instead of on BellSouth's current retail package, which includes such services.

    2.    "Customized Routing" under 47 C.F.R. § 51.319(c)(1)(iii)(B) and 11 F.C.C.R. at 15772-73, ¶ 536

---

[8] The Eighth Circuit vacated the FCC cost methodology because it focused on costs avoidable in theory versus costs actually avoided in practice.  See Iowa Utils. Bd. v. F.C.C., 219 F.3d 744 (8th Cir. 2000), 755, cert. granted on other grounds, __ U.S. __, 121 S. Ct. 877 (2001).  This distinction, however, does not affect our present discussion.

Beyond the "other costs" argument under § 252(d)(3), the district court relied on 47 C.F.R. § 51.319 and 11 F.C.C.R. at 15772-73, ¶ 536[9] to justify its decision regarding operator services.  The court observed that under these two FCC provisions, BellSouth, as an incumbent carrier, has a duty to provide new entrants like AT&T with "customized routing."[10] AT&T Communications, 122 F. Supp. 2d at 1315.  From the district court's perspective, customized routing is "the functional equivalent of requiring BellSouth to provide AT&T local service without operator services" for resale.  Id.  The district court's reliance on the two customized routing provisions in concluding that BellSouth had to eliminate operator services from its resold services package, however, is misplaced.

---

[9]In August 1996, the FCC issued its First Report and Order on the Implementation of the Local Competition Provisions of the Act.  Challenges to the rules were consolidated and assigned to the Eighth Circuit under 28 U.S.C. § 2112(a)(3).  The Eighth Circuit vacated all of the FCC's pricing regulations on jurisdictional grounds as well as several nonpricing provisions.  Iowa Utils. Bd.,120 F.3d at 819 & n.39.  The Supreme Court reversed on the jurisdictional issue and held that the FCC had jurisdiction to issue pricing regulations.  AT&T, 525 U.S. at 385, 392-96, 119 S. Ct. at 733, 736-38.  The Court's decision in effect reinstated almost all of the FCC's pricing and nonpricing regulations.  On remand, however, the Eighth Circuit struck down the FCC's pricing methodology rules on the merits.  Iowa Utils. Bd., 219 F.3d 744.  The Court granted certiorari to review the Eighth Circuit's determination regarding the pricing regulations for the unbundled access provision, but not the pricing regulations for the resale provision. __ U.S. __, 121 S. Ct. 877.  The panalopy of challenges to the FCC's First Report and Order does not affect the operator services issue or the specific FCC provisions addressed in this case.

[10]"Customized routing" refers to the process by which incumbent carriers route calls to operators of competing carriers.  Such routing occurs when a competitor's customers who are served over the incumbent's telecommunications facilities request to speak with the competitor's operators.  See Brief for Appellant BellSouth Communications, Inc., at 8.

The primary problem with the district court's customized routing discussion is that such routing is an obligation placed on incumbents under the unbundled access provision, not the resale provision, and so it is inapplicable to the present action. We turn first to 47 C.F.R. § 51.319(c)(1)(iii)(B). Section 51.319 does address an incumbent's customized routing obligations to new entrants,[11] but the section is titled "Specific *unbundling* requirements." (emphasis added). This reference to "unbundling" contextualizes § 51.319 because "unbundling" is a term of art under 47 U.S.C. §§ 251-52; the reference indicates that the FCC is discussing an incumbent's obligations when a new entrant purchases access to the incumbent's facilities under the unbundled access provision, not the resale provision. Indeed, § 51.319 is contained in subpart D of the FCC interconnection rules, but "the rules governing resale of services by an incumbent . . . are set forth in subpart G [§§ 51.601-51.617]." § 51.201. It follows that § 51.319(c)(1)(iii)(B)

---

[11]47 C.F.R. § 51.319(c) states that "an incumbent . . . shall provide nondiscriminatory access, in accordance with § 51.311 and section 251(c)(3) of the Act, to local circuit switching capability." "Local circuit switching capability," § 51.319(c)(1), includes, but is not limited to, "any technically feasible customized routing functions provided by the switch," § 51.319(c)(1)(iii)(B). In citing to particular subsections of § 51.319, we have used the subsections as they are delineated in the 2000 version of the C.F.R. AT&T and Bellsouth negotiated and entered into their interconnection agreement in 1996-97. As a result, we have reviewed the version of § 51.319 applicable at that time. Although the substantive language of § 51.319 at issue here is the same in the earlier version, the internal organization of the section is different. We have used the current subsection delineations for the convenience of the reader.

is inapplicable to the present dispute over operator services between BellSouth and AT&T, a dispute that only concerns the Act's resale provision.

We reach a similar conclusion with regard to 11 F.C.C.R. at 15772-73, ¶ 536. Paragraph 536 provides that "incumbent[s] . . . must *unbundle* the facilities and functionalities providing operator services and directory assistance from resold services and other unbundled network elements to the extent technically feasible." Id. at 15773. (emphasis added). As with § 51.319, the reference here to "unbundle" indicates that paragraph 536 refers to an incumbent's obligations under the unbundled access provision. Unlike § 51.319, however, there is reference in paragraph 536 to "resold services," which at first glance might suggest that the paragraph also creates incumbent obligations under the resale provision. Upon closer inspection, this suggestion proves erroneous.

Paragraph 536 is found in section V of the FCC First Report and Order, entitled "ACCESS TO UNBUNDLED NETWORK ELEMENTS," not section VIII, entitled "RESALE." The reference to the term of art "unbundled" in the section title again suggests that paragraph 536 only concerns obligations under the unbundled access provision. Moreover, if the FCC meant the paragraph to impose obligations under the resale provision, the paragraph would have appeared, or one

akin to it would have appeared, in section VIII, "RESALE." There is no paragraph, however, that is analogous to 536 found in the "RESALE" section.

In fact, in AT&T's own comments to the FCC's proposed order, AT&T called for the FCC to adopt a rule directing incumbents to make local service available for resale without operator services. See Reply Brief for Appellant BellSouth, Addendum at 81 n.123, (Comments of AT&T Corp. in In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, CC. Docket No. 96-98, (FCC May 16, 1996)) ("The Commission should . . . consider adopting a rule requiring that resellers be permitted to provide their own operator services in conjunction with resale of the [incumbent's] local service. . . ."). The FCC explicitly took note of AT&T's request, but the FCC referenced it in paragraph 870 of section VIII, "RESALE," not in paragraph 536 of section V. 11 F.C.C.R. at 15933, ¶ 870 ("AT&T specifically argues that it should be allowed to purchase local exchange service without operator services."). Further, the FCC specifically refused to grant AT&T's request: "We need not prescribe a minimum list of services that are subject to the resale requirement." Id. at 15934, ¶ 872. That the FCC specifically referenced the operator services issue in the "RESALE" section, yet explicitly declined to settle the matter, strongly

militates against reading paragraph 536, which is vague and amorphous compared to paragraph 872, as dispositive of the same issue.

We therefore conclude that the district court erred in interpreting paragraph 536 of the FCC First Report and Order as bearing upon the operator services issue in the resale context. Instead, we read the paragraph as stating that when a new entrant, pursuant to the unbundled access provision, seeks to purchase access to elements of an incumbent's telephone network, the incumbent, when technically feasible, must unbundle operator services from other network elements and from the complete service it has otherwise made available for resale. Put another way, paragraph 536 states that, irrespective of whether operator services were included in the incumbent's services package offered for resale, if the new entrant seeks network elements under the unbundled access provision, then the incumbent must segregate out operator services elements so that the new entrant has more options in choosing which elements to include in its own network. Paragraph 536 does not speak to the fate of operator services under the resale provision, and so, by extension, does not speak to the case at bar.

The district court, by misinterpreting an incumbent's customized routing obligations under 47 C.F.R. § 51.319(c)(1)(iii)(B) and 11 F.C.C.R. at 15772-73, ¶ 536, essentially conflated an incumbent's obligations under the unbundled access

provision with the separate and distinct obligations imposed under the resale provision of the Act. The court's conflation of an incumbent's obligations under the two provisions, besides resting on a misinterpretation of the relevant FCC regulations, fails to give effect to an integral difference between those two provisions and leads to serious cost implications, which we now address.

With regard to unbundled access, 47 U.S.C. 251(c)(3) states that "[a]n incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows the *requesting carriers* to combine such elements in order to provide such telecommunications service." (emphasis added). Section 251(c)(3) permits a new entrant to purchase access to individual parts of the incumbent's network elements, but to do so the entrant itself must incur the costs of "rebundling" these individual pieces into a complete service offered to its own local customers. Thus, under the unbundled access provision, BellSouth must set apart operator service elements and offer AT&T access to individual parts of its local telephone network, but, in turn, AT&T must bear the costs of recombining those parts into a services package that it then can market to its own customer base.

In contrast, with regard to the resale provision, incumbents are only required to offer to new entrants the local telephone services package they already offer to their customers "at retail." 47 U.S.C. § 251(c)(4)(A). That is, the resale provision

only requires incumbents to offer bundled, or prepackaged, services to new entrants. Thus, if an incumbent like BellSouth does not offer a services package to its retail customers that lacks operator services, it is not required to offer to new entrants a services package that lacks such services. Otherwise, incumbents would be forced to offer to new entrants a telephone services package different from that offered at retail, which collapses the distinction between the unbundled service elements offered under the unbundled access provision and the bundled service elements offered under the resale provision.

Eliminating the distinction between unbundled and bundled services has serious cost implications. We have explained that a new entrant, pursuant to the unbundled access provision, is entitled to purchase access to individual pieces of an incumbent's service network, but the entrant must incur the costs of rebundling those pieces to form its own network. If the new entrant instead can use the resale provision to require incumbents to offer services packages for resale different from the complete packages incumbents already offer to retail customers, the entrant can shift the costs of rebundling to the incumbent. In effect, the incumbent would have to unbundle its current services package offered at retail and then bear the costs of rebundling its service elements to fit the new entrant's specifications. Such cost shifting under the resale provision would undercut the cost methodology

of unbundled access, a methodology under which new entrants are to incur the costs of creating new service configurations out of unbundled network elements provided by the incumbent.

Applying these considerations to the case at hand, we find that AT&T should not be able to circumvent the costs imposed by unbundled access by attempting to require BellSouth to unbundle operator services under the resale provision. If AT&T desires individual parts of BellSouth's local network without operator service elements, it must incur the costs of recombining those parts into a workable telecommunications system. What AT&T cannot do is proceed under the resale provision and require BellSouth to unbundle its current retail services package–which both parties agree does not include a services package lacking operator services– and then require BellSouth to reconfigure that package to exclude operator services per AT&T's own desired specifications. This cost-shifting ploy would permit AT&T to obtain unbundled services at the bundled services price. Not only would AT&T be able to take advantage of any artificialities in price created by a history of universal service in Florida, which we have explained, but also it would simultaneously obtain the functional equivalent of unbundling in the resale context. We refuse to interpret the distinct unbundled access and resale provisions under 47 U.S.C. § 251 in a manner that would create

27

such an inequitable and anticompetitive result. Consequently, we hold that the district court erred in interpreting FCC customized routing provisions to require BellSouth to unbundle its operator services from its complete services package offered to AT&T for resale.

## III. CONCLUSION

This appeal involved a challenge to a final judgment in which the district court held that, under the Act, BellSouth, as an incumbent local exchange carrier, had to exclude its operator services from its complete services package offered to AT&T for resale. As we have explained, the district court erred in so holding because the court, failing to interpret the resale provision in view of the historical backdrop of universal service and its accompanying tariff regime in Florida, improperly concluded that operator services constitute "other costs" under 47 U.S.C. § 252(d)(3). In addition, we have concluded that the district court improperly linked operator services to the customized routing obligations enunciated in 47 C.F.R. § 51.319(c)(1)(iii)(B) and 11 F.C.C.R. at 15772-73, ¶ 536. Accordingly, we REVERSE the judgment and REMAND for further proceedings consistent with this opinion.