**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 16 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SOUTHWESTERN BELL
TELEPHONE COMPANY,

      Plaintiff - Appellant,

v.

ED APPLE, Chairman, BOB
ANTHONY, Vice Chairman, and
DENISE BODE, Commissioner, in
their official capacities as
Commissioners of the Oklahoma
Corporation Commission;
OKLAHOMA CORPORATION
COMMISSION; and AT&T
COMMUNICATIONS OF THE
SOUTHWEST, INC.,

      Defendants - Appellees.

No. 00-6030

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-97-1507-A)**

---

Colin S. Stretch (Mary W. Marks, Southwestern Bell Telephone Company,
Oklahoma City, OK, Michael K. Kellogg & Sean A. Lev, Kellogg, Huber,
Hansen, Todd, & Evans, P.L.L.C., Washington, D.C., with him on the briefs),
Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, D.C., for
Plaintiff-Appellant, Southwestern Bell Telephone Company.

Michael J. Hunseder (Lawrence Lafaro, AT&T Corp., Basking Ridge, NJ, Mark
Witcher, AT&T Corp, Austin, TX, & David L. Lawson, Sidley, Austin, Brown &

Wood, Washington, D.C., with him on the brief), Sidley, Austin, Brown & Wood, Washington, D.C., for Defendant-Appellee, AT&T Communications of the Southwest, Inc.

Rachel Lawrence Mor, Deputy General Counsel, Andrea Johnson, Senior Attorney, Oklahoma City, OK, submitted a brief for Defendant-Appellee, Oklahoma Corporation Commission.

---

Before **EBEL**, **McKAY**, and **LUCERO**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

This case concerns certain obligations that the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified at 47 U.S.C. § 251 *et seq*.), ("the Act"), imposed on incumbent providers of local telephone service. Two of the Act's obligations on incumbent service providers, such as Southwestern Bell ("SWBT"), are at issue in this case: a resale duty and a duty to provide access to elements of the incumbent's network. The United States District Court for the Western District of Oklahoma found that an end-user limitation imposed by SWBT on its optional toll calling plans sold to AT&T was an unreasonable resale restriction, in violation of the Act. In a separate order, it instructed SWBT to provide AT&T with immediate access to certain network elements. Exercising our jurisdiction pursuant to 28 U.S.C. § 1291, we reverse the district court's order pertaining to the end-user limitation and vacate its order dealing with access to network elements.

# I. THE ACT

In 1996, Congress enacted the Telecommunications Act of 1996, which "fundamentally change[d] telecommunications regulation" by introducing competition in the local service market. See First Report and Order, Implementation of the Local Competition Provisions in the Telecomm. Act of 1996, 11 FCCR 15,499 ¶ 1 (1996) ("Local Competition Order".)[1] Prior to the Act, telephone service was a regulated monopoly, in which incumbent providers enjoyed protection from new companies entering the market. The Act sought to "remove the outdated barriers that protect monopolies from competition and affirmatively promote efficient competition." Id. Under the Act, incumbent local exchange carriers ("ILECs"), ones which previously had enjoyed a monopoly over the provision of local telephone service, acquired affirmative duties. Incumbent LECs must (1) provide unbundled access to their network elements[2] ("unbundled

---

[1] In addition to the Act's implementing regulations dealing with the resale duty, see 47 CFR §§ 51.601-51.617, the FCC's extensive Local Competition Order guides telephone providers, state commissions, and federal courts in interpreting provisions of the Act. This Order continues to endure a protracted process of modification, but the parties agree that the relevant portions for this case remain the same as in the initial order. See Local Competition Order, 11 FCCR 15,499 (1996), *modified on recon.*, 11 FCCR 13,042 (1996), *vacated in part*, Iowa Utils. Bd. v. FCC, 120 F.3d 753 (8th Cir. 1997), *aff'd in part, rev'd in part sub nom.* AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366 (1999), *decision on remand*, Iowa Utils. Bd. v. FCC, 219 F.3d 744 (8th Cir. 2000), *aff'd in part, rev'd in part sub nom.* Verizon Communications Inc. v. FCC, 122 S. Ct. 1646 (2002).

[2] Network elements include "discrete facilities" of the incumbent's

(continued...)

access provision"), 47 U.S.C. § 251(c)(3), and (2) "offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers" ("resale provision"). 47 U.S.C. § 251(c)(4)(A). The resale duty also prohibits ILECs from imposing "unreasonable or discriminatory conditions or limitations" on the resale of "such telecommunications service." 47 U.S.C. § 251(c)(4)(B).

These distinct duties on ILECs offer unique opportunities to new market entrants and are premised on different pricing strategies. Under the unbundled access provision, a new competitor local exchange carrier ("CLEC") can acquire various network elements from an ILEC and can reconfigure them in various packages to sell to end-users. Unbundled access "permit[s] new entrants to offer competing local services by purchasing from incumbents, at cost-based prices, access to elements which they do not already possess, unbundled from those elements that they do not need." See Local Competition Order ¶ 231 (emphasis added). In contrast, if a CLEC buys services under the resale provision, it is able to resell that service under its own name, but is limited to selling the service that the ILEC provides "at retail." 47 U.S.C. § 251(c)(4)(A). These services are purchased at wholesale rates, which are determined by subtracting costs avoided

---

[2](...continued)
network, such as switches and loops, as well as an incumbent's Operational Support Systems ("OSS").

from the ILEC's retail rate. See 47 U.S.C. § 252(d)(3). In other words, the proper starting point for determining the wholesale price under the resale provision is the retail price (from which one subtracts the ILEC's avoided costs), whereas under the unbundled access provision, the starting point is cost.[3] See generally AT&T Communications of the S. States, Inc. v. Bell South Telecomm., Inc., 268 F.3d 1294, 1297-98 (11th Cir. 2001) (discussing different pricing methodologies).

## II. BACKGROUND

AT&T seeks to enter the Oklahoma market for local telephone service. The parties agree that SWBT, an incumbent provider of local service in the state, is obligated to resell to AT&T telephone services that SWBT provides to its own customers. The services at issue are certain optional toll calling plans ("OTCP"), under which customers can opt to make unlimited calls within a certain geographic radius for a flat monthly fee. The OTCP allows customers to widen their "'free calling' area, and thereby turn what would otherwise be considered toll calls [long distance] into local calls that are covered by the local service fee."

---

[3] The parties do not contest the pricing determination of either the resale of the optional toll calling plans or access to the OSS, but we include the different pricing strategies to illustrate the distinction between the unbundled access and resale provisions.

(Aplt. B. at 10.) SWBT offers these plans to single-users only, and specifically prohibits multiple users from sharing one plan. SWBT seeks to impose this single-user limitation on AT&T's resale of the plan, essentially requiring that AT&T only sell one plan to one end-user. AT&T contends that this condition is a "restriction on resale," which is generally presumed to be unreasonable under the Act. SWBT, on the other hand, contends that the condition is a "use limitation" as opposed to a restriction on resale, and that eliminating the restriction would allow AT&T to resell services that SWBT does not currently provide to its own customers.

AT&T challenged the single-user limitation before the Oklahoma Corporation Commission ("OCC"), which agreed with SWBT. The OCC concluded that AT&T literally would be offering a different service for resale than the one that SWBT currently offers its customers, a situation that the Act does not require. It further concluded that the restriction was reasonable and non-discriminatory. AT&T appealed the OCC's decision to the United States District Court for the Western District of Oklahoma, which disagreed with the OCC and held that the restriction was a resale restriction and that SWBT had not overcome the restriction's presumption of unreasonableness.

## III. DISCUSSION

A. <u>Standard of Review</u>

Although the Act provided for federal court review of state commission decisions concerning interconnection agreements, <u>see</u> 47 U.S.C. § 252(e)(6),[4] it did not articulate the standard of review that courts should apply to those decisions. <u>See</u> Philip J. Weiser, <u>Chevron, Cooperative Federalism, and Telecommunications Reform</u>, 52 Vand. L. Rev. 1, 20 (1999). The Tenth Circuit has joined most other federal courts in applying a de novo standard when reviewing state commissions' interpretations of the Act and its regulations, as those decisions turn on determinations of federal law. <u>Southwestern Bell Tel. Co. v. Brooks Fiber Communications of Okla., Inc.</u>, 235 F.3d 493, 498 (10th Cir. 2000). <u>See</u> also <u>MCI Telecomm. Corp. v. Bell Atlantic-Pennsylvania</u>, 271 F.3d 491, 517 (3d Cir. 2001); <u>US West Communications v. MFS Intelenet, Inc.</u>, 193 F.3d 1112, 1117 (9th Cir. 1999); <u>MCI Telecomm. Corp. v. BellSouth Telecomm., Inc.</u>, 112 F. Supp. 2d 1286, 1290-1292 (N.D. Fla. 2000); <u>US West Communications, Inc. v. Hix</u> ("<u>Hix I</u>"), 986 F. Supp. 13, 19 (D. Colo. 1997)

---

[4] "[A]ny party aggrieved by [a state commission determination concerning an interconnection agreement] may bring an action in the appropriate Federal district court to determine whether the agreement . . . meets the requirements of section 251 of this title and section." 47 U.S.C. § 252(e)(6). The dispute in this case involved the Oklahoma Corporation Commission's resolution of disputes over SWBT and AT&T's interconnection agreement.

(holding that courts should apply de novo review to questions of whether the state commissions' actions were "procedurally and substantively in compliance with the Act and [its] implementing regulations"); see also Michigan Bell Tel. Co. v. Climax Tel. Co., 121 F. Supp. 2d 1104, 1108-09 (W.D. Mich. 2000) (stating that the Fourth, Fifth, and Ninth circuits have used de novo review of state commissions' application of the Act); US West Communications, Inc. v. Hix ("Hix II"), 93 F. Supp. 2d 1115, 1130 (D. Colo. 2000) (applying de novo review to state commission's interpretation of the Act and its regulations); BellSouth Telecomm., Inc. v. ITC Deltacom Communications, Inc., 62 F. Supp. 2d 1302, 1307 (M.D. Ala. 1999) (adopting de novo standard of review for questions of whether state commission "properly interpreted and applied the Act") (internal quotation marks omitted); Weiser, supra, at 20 (stating that "federal courts have declined to accord state agencies [deference] . . . when it comes to construing ambiguous statutory terms or filling gaps in the Telecom Act" and collecting cases).[5]

---

[5] In US West Communications, Inc. v. Public Serv. Comm'n of Utah, 75 F. Supp. 2d 1284, 1287 (D. Utah 1999), the court declined to follow Hix I and applied a "deferential standard" to the state commissions's interpretations of the Act. Subsequently in Southwestern Bell Tel. Co. v. Brooks Fiber Communications of Okla., Inc., 235 F.3d 493 (10th Cir. 2000), however, we instructed that district courts should review de novo whether state commission determinations are "in compliance with the Act and [its] implementing regulations," joining with the Fourth, Fifth and Ninth Circuits. 235 F.3d at 498.

Once federal courts determine that state commissions properly interpreted the Act and its regulations, courts apply an arbitrary and capricious standard to review the remaining state commissions' determinations. MCI Telecomm. Corp., 112 F.Supp. 2d at 1291; see also AT&T Communications of the S. States, Inc. v. BellSouth Telecomm., Inc., 7 F. Supp. 2d 661, 668 (E.D.N.C. 1998) (explaining that federal courts review de novo state commission's interpretation of the Act, but that if state commission's interpretation is in compliance with federal law, that federal courts review all other issues using arbitrary and capricious standard); Hix I, 986 F. Supp. at 19 (same).

Most federal courts to analyze claims similar to the ones at issue in this case have applied de novo review, and reserved the arbitrary and capricious standard for highly technical issues. See, e.g., Bell Atlantic-Pennsylvania, 271 F.3d at 520-21 (reviewing de novo whether directory publishing services were a "telecommunications service" that ILEC was obligated to offer CLEC at wholesale rates under § 251(c)(4)(A)); AT&T Communications of the S. States, 268 F.3d at 1296 (characterizing what services an ILEC must provide to a CLEC under the resale provision as "a purely legal question" to be reviewed de novo); U.S. West Communications, Inc., 193 F.3d at 1120-26 (reviewing de novo whether certain services were exempt from the Act's resale provisions, but applying an arbitrary and capricious standard of review to state commission's characterization of a

switch as a "tandem switch" because it was not "a determination of compliance with the requirements of the Act and its implementing regulations"); Sprint-Florida, Inc., 139 F. Supp. 2d at 1345 (reviewing de novo state commission's determination that voice mail was a "telecommunications service" that ILEC had to offer CLEC at wholesale rates under the Act's resale provision). Accordingly, we review the issues presented de novo.

B. Resale Duty

Under the Act, ILECs only have a duty to offer for resale at wholesale rates "any telecommunications service that the [ILEC] provides at retail to subscribers who are not telecommunications carriers," 47 U.S.C. § 251(c)(4)(A), and an ILEC may not impose unreasonable restrictions on the resale of those telecommunications services, id. § 251(c)(4)(B). Both parties agree that SWBT must resell its OTCPs to AT&T at wholesale rates. AT&T contends, however, that SWBT's single-user limitation on its OTCPs amounts to an unreasonable restriction on resale as prohibited by § 251(c)(4)(B). If aggregating end-users on one OTCP converts the OTCP into a "different service" than SWBT offers at retail, as the OCC found, then SWBT is not required under the Act to offer such a service to AT&T at a wholesale rate. See Local Competition Order ¶ 872 ("The 1996 Act does not require an incumbent LEC to make a wholesale offering of any service that the incumbent LEC does not offer to retail customers.").

The Act's regulations further reiterate that an ILEC need only offer to a CLEC at wholesale the services that the ILEC provides at retail. The regulations instruct that ILECs must provide telecommunications services for resale "that are equal in quality, <u>subject to the same conditions</u>, and provided within the same provisioning time intervals that the LEC provides these services to others, including end users." 47 CFR § 51.603(b) (emphasis added). The Local Competition Order provides even more guidance about the parameters of an ILEC's resale duty. It explains that the "principal distinction" between the resale provision and the unbundled access provision is that under the unbundled access provision, new entrants "will have greater opportunities to offer services that are <u>different from those offered by incumbents</u>." <u>Local Competition Order</u> ¶ 332 (emphasis added.) It goes on to state,

> More specifically, carriers reselling incumbent LEC services are limited to offering the same service an incumbent offers at retail. This means that resellers cannot offer services or products that incumbents do not offer. The <u>only means</u> by which a reseller can distinguish the services it offers from those of an incumbent is through price, billing services, marketing efforts, and to some extent, customer service.

<u>Id.</u> (emphasis added).

To "determine the services that an incumbent LEC must provide at wholesale rates," under the resale provision, one "examin[es] that ILEC's retail tariffs." <u>See Local Competition Order</u> ¶ 872. Focusing on what service the ILEC offers at retail, as opposed to what service the CLEC wishes to offer, maintains the

- 11 -

statutory differences between the resale and unbundled access provisions. To approach the issue focused on what the CLEC wishes to sell, "would . . . force[] [ILECs] to offer to new entrants a telephone services package different from that offered at retail, which collapses the distinction between the unbundled service elements offered under the unbundled access provision and the bundled service elements offered under the resale provision." AT&T Communications of the S. States, Inc., 268 F.3d at 1304 (holding that if an incumbent does not offer a service package to its retail customers that lacks operator services, it is not required to offer new entrants a service package that lacks such services). As discussed above, the resale provision and the unbundled access provision are based on distinct pricing methodologies, so eliminating the distinction between the two would carry "serious cost implications." Id.

The one court to examine a similar factual pattern dealing with a limitation on aggregation of toll service for retail concluded that the CLEC could not resell the toll service stripped of the "use limitations that [the ILEC] imposed on its own customers." See AT&T Communications of the Southwest, Inc. v. Southwestern Bell Tel. Co., 86 F. Supp. 2d 932, 966 (W.D. Mo. 1999), rev'd in part, vacated in part, and remanded sub nom. Southwestern Bell Tel. Co. v. Mo. Pub. Serv. Comm'n, 236 F.3d 922 (8th Cir. 2001). In that case, AT&T argued, as it does here, that the restriction prohibiting AT&T from "purchasing toll service that

SWBT only sells to single customers and reselling the service to groups of customers" amounted to an unreasonable restriction on resale. Id. at 965. The court squarely rejected that argument, and found that the state commission reasonably concluded that "eliminating the single customer restriction from [SWBT's] toll service would transform it into a different service." Id. at 966. Therefore, the court upheld the state commission's determination that "SWBT was only required to resell toll service with the same use limitations that it imposed on its own customers." Id.

Here, SWBT's retail tariffs[6] for its OTCPs clearly state that "the sharing of this service for multiple end users or the aggregation of traffic from multiple end users onto a single service shall not be permitted." (App. at 131, § 10.1(G).) The service that SWBT provides at retail to its customers is an OTCP that is available only for use by a single user, and for which aggregation of multiple end-users or traffic explicitly is prohibited. We therefore conclude that AT&T may purchase OTCPs from SWBT under the resale provision and resell them subject to the same single-user limitation that SWBT is subject to when it sells OTCPs at retail. See

---

[6] SWBT's tariff was before the OCC as part of the commission's public record, even though SWBT did not provide the OCC with the tariff separately as part of its appendix. The testimony before the OCC regarding the single-user limitation in SWBT's tariff was undisputed. Although our record is limited to what was before the OCC, see GTE South, Inc. v. Morrison, 6 F. Supp. 2d 517, 523 (E.D. Va. 1998), the OCC had the tariff before it and SWBT has provided a copy of its tariff to this court for reference.

MCI Telecomm. Corp. v. BellSouth Telecomm., Inc., 40 F. Supp. 2d 416, 426-27 (E.D. Ky. 1999) (holding that "forcing [an ILEC] to provide for resale to [a CLEC], a package that [the ILEC] does not even offer to its own customers" would be contrary to the resale provision of the Act). If AT&T wishes to offer services that SWBT does not provide at retail to its own customers, such as an OTCP stripped of the single-user limitation, then it may do so by leasing unbundled network elements under the unbundled access provision, and generating its own service, but it may not do so under the resale provision.

We reject AT&T's argument that the single-user limitation prevents it from pursuing high-volume discounts. In the Local Competition Order, the FCC found it "presumptively unreasonable" for "incumbent LECs to require individual reseller end users to comply with incumbent LEC high-volume discount minimum usage requirements, so long as the reseller, in aggregate, under the relevant tariff, meets the minimal level of demand." Local Competition Order ¶ 953. The prohibition on aggregating end-user traffic, however, does not prevent AT&T from buying multiple OTCPs in bulk at a discount (if they are offered at volume discounts by SWBT to its customers) and selling them individually, subject to the same use limitations as SWBT sells them, to smaller customers. Volume discounts pertain to the quantity bought. What AT&T is attempting to do has nothing to do with buying multiple OTCPs at an established bulk discount and then reselling

them to separate end users at a lower per-unit price; AT&T is trying to change the nature of the service.[7]

Finally, we find that imposing the single-user limitation on AT&T is consistent with the Act and reasonable, because it allows SWBT to protect the access charges it receives. Access charges are the charges that long-distance carriers such as AT&T pay to use the local network to originate and terminate long-distance calls. These access charges help subsidize universal service–affordable basic telephone service for all customers, even those who live in rural areas where it is more expensive to provide local service. See 47 U.S.C. § 254(b); Qwest Corp.v FCC, 258 F.3d 1191, 1195 (10th Cir. 2001). The Local

---

[7] A simple analogy illustrates the distinction between utilizing high-volume discounts and manipulating restrictions on a flat-rate system. Assume that a gym membership for one person costs $100 a month and allows one person unlimited use of the gym. It is strictly non-transferable. The gym also offers gym passes, whereby a visitor can use the gym for $10 per visit. One can make a bulk purchase of 8 passes in a booklet for $72 (or $9 a visit). A person must purchase at least 8 passes in bulk, however, to receive the discounted rate of $9 per visit. If one purchases a book of 8 passes and resells them to his friends for $9.50 each, each friend has received a discounted rate to which he would not be entitled if he bought a single pass directly from the gym. To the gym, however, the effects are the same: the gym is being utilized eight times and it has received a sum of $72 for that use. By contrast, if the holder of a monthly unlimited use membership allows other persons to use his or her monthly membership, the gym will be experiencing heavier use than it bargained for in setting the monthly price for a single user at $100 a month. The usage experienced by the gym certainly is greater in allowing multiple users to take advantage of one's non-transferable flat rate, than if one acts as a true wholesaler and sells discounted tickets purchased under a high volume discount.

Competition Order specifically preserves the right of ILECs to receive these access charges. "We conclude that the 1996 Act requires that incumbent LECs continue to receive access charge revenues when local services are resold under section 251(c)(4)." Local Competition Order ¶ 980. See Southwestern Bell Tel. Co. v. FCC, 153 F.3d 523, 538 (8th Cir. 1998) ("The courts have recognized that universal service concerns are valid considerations for FCC action."). SWBT contends that an OTCP includes access charges based on expected volumes from a single customer and that if AT&T resells one of these plans to multiple users, then it will avoid paying SWBT access charges that it would otherwise be required to make for the services that it provides to those additional end-users. Unlike aggregation in the high-volume discount context, where the effects on an ILEC are the same whether the volume package is sold by SWBT to its own customers or to AT&T, here SWBT stands to lose access charges based on long-distance traffic from multiple users, because in pricing its OTCP it only budgeted access charges based on a single user. Allowing AT&T to aggregate end-user traffic on an OTCP would allow it to avoid paying access charges to SWBT for those long distance calls, a result which contravenes the Act's policy of protecting ILECs' receipt of access charges.

We reverse the district court's order pertaining to the end-user limitation on SWBT's OTCP and affirm the OCC's resolution of the issue.

C. <u>OSS</u>

The parties also disagreed over the time frame for and quality of access that SWBT was required to provide AT&T to SWBT's Operational Support Systems ("OSS".)[8] The OSS falls under the category of "unbundled network elements," to which new entrants are entitled access under the Act. The OCC found that SWBT was required to provide AT&T with access to SWBT's OSS on a schedule that was triggered by the development of national standards. The district court rejected this approach, ordering SWBT to "provide immediate access to OSS of the same quality SWBT provides to its own customers." SWBT argues that this standard is incorrect and that this court should either reverse or remand it to the district court with instructions to vacate or amend the order.

We dismiss this issue as moot, as both parties have reached a new agreement regarding SWBT's obligations with respect to OSS. We vacate the district court's opinion, as it is inconsistent with the parties' agreement and because the FCC's current regulations do not require immediate access to OSS. <u>See</u> <u>Implementation of the Local Competition Provisions of the Telecomm. Act of 1996</u>, 15 FCCR 3696, 3884 ¶ 437 (1999) (declining to adopt a specific timetable for access to OSS

---

[8] Operational Support Systems are the "functions supported by an incumbent LEC's databases and information," including "pre-ordering, ordering, provisioning, maintenance and repair, and billing." 47 C.F.R. §51.319(g).

functions), remanded in part by United States Telecomm. Ass'n v. FCC, 290 F.3d 415 (D.C. Cir. 2002).

## IV.

We REVERSE the district court's opinion pertaining to the end-user limitation on SWBT's OTCPs and VACATE the district court's opinion regarding access to SWBT's OSS. We REMAND this case to the district court for further proceedings consistent with this opinion.