NEW ACCESS COMMUNICATIONS, L.L.C. and Choicetel Communications, Inc., Petitioners,

v.

QWEST CORPORATION, Respondent and Third–Party Plaintiff,

v.

The Minnesota Public Utilities Commissioners, Leroy Koppendrayer, R. Marshall Johnson, Kenneth Nickolai, and Phyllis Reha, Third–Party Defendants.

No. CIV. 04–3529JRT/FLN.

United States District Court, D. Minnesota.

March 31, 2005.

Lewis A. Remele, Jr. and Christopher R. Morris, Bassford Remele, Minneapolis, MN, for petitioners.

Larry D. Espel and Jeanette M. Bazis, Greene Espel, P.L.L.P., Minneapolis, MN, and Jason D. Topp, Qwest Corporation, Minneapolis, MN, for respondent and third-party plaintiff.

Brian Hans Sande, Assistant Attorney General, Office of the Minnesota Attorney General, St. Paul, MN, for third-party defendants.

## MEMORANDUM OPINION AND ORDER

TUNHEIM, District Judge.

Plaintiffs New Access Communications and its wholly owned subsidiary, Choicetel (together, "New Access") request the Court to confirm an arbitration award, which defendant/third-party plaintiff Qwest Corporation ("Qwest") moves to vacate. Qwest also moves the Court for an order requiring the third-party defendants Minnesota Public Utilities Commission and commissioners (collectively, "MPUC") to review the arbitration award. For the following reasons, the Court confirms the arbitration award and denies Qwest's motions.

## BACKGROUND

Qwest is a Colorado corporation that provides local telephone service in Minnesota and thirteen other states. New Access provides local telephone service in eight of the states where Qwest also provides service. Qwest is considered an incumbent local exchange carrier ("I–LEC"), while New Access is a competitive local exchange carrier ("C–LEC").

The Telecommunications Act of 1996 ("the Act") requires I–LECs to sell local services at a wholesale rate to C–LECs and to allow C–LECs to interconnect with

I–LEC facilities. 47 U.S.C. § 251(c)(2) and (4). The Act permits C–LECs to negotiate and enter into interconnection agreements with I–LECs or to opt-in to already existing interconnection agreements. *See* 47 U.S.C. §§ 251(c)(1) and 252(e) and (i). Any interconnection agreement must be submitted to and approved by the appropriate state public utilities commission. 47 U.S.C. § 252(e).

The Act assigns responsibility for determining wholesale rates to state public utilities commissions, and defines the formula and method that the commissions are to employ. 47 U.S.C. § 252(d)(3); 47 C.F.R. § 51.607(a). Notwithstanding the Act's requirement that C–LECs be extended adjusted wholesale rates, I–LECs are not required to adjust and make available to C–LECs short-term promotional retail prices. 47 C.F.R. § 51.613.

New Access opted-in to a series of interconnection agreements that Qwest had negotiated with other C–LECs in eight states, including Minnesota. Each of the interconnection agreements was filed with and approved by the relevant state public utilities commission, including, in Minnesota, the MPUC. Under these interconnection agreements, Qwest is to offer New Access any telecommunications service that it offers to its own customers at the wholesale rate. *See, e.g.,* Minnesota Interconnection Agreement §§ 6.1.1, 6.1.3, 6.3.1 (hereinafter "MICA"). The interconnection agreements make clear that any changes or amendments to the agreements by the parties must be in writing, although the public utilities commissions have the ultimate authority to change the terms under which Qwest sells services to New Access. *See, e.g.,* MICA §§ 5.30.1, 6.3.1, 6.3.8. The interconnection agreements also indicate that any rate changes are to have prospective effect. *See, e.g.,* MICA

§§ 6.3.9, 6.3.7. In accordance with the FCC rules, promotional offerings for less than 90 days need not be adjusted and resold at the wholesale rate. *See, e.g.,* MICA § 6.2.2. The interconnection agreements detail a dispute resolution process, under which either party may demand that a dispute be settled by arbitration under the rules of the American Arbitration Association ("AAA"). *See, e.g.,* MICA § 5.18. Any arbitration award is to be submitted to the public utilities commission for review. *See, e.g.,* MICA § 5.18.3. "The arbitrator's decision shall prevail in effect unless the Commission decides otherwise within forty-five (45) days." *Id.*

In February 1999, Qwest received approval from the MPUC for a short-term promotional offer designed to "win back" customers who had switched to Qwest's competitors. C–LECs could purchase the win back promotion according to the same terms that Qwest was offering to its retail customers, but were not offered the promotion at a wholesale rate.

Three years later, in February 2002, the Minnesota Department of Commerce ("DOC") filed a complaint against Qwest with the MPUC alleging that Qwest had formed twelve interconnection agreements with C–LECs without submitting them to the MPUC in violation of the Act and state communications law. The MPUC determined that Qwest had knowingly and intentionally violated both federal and state law, and assessed $25.95 million in penalties, as well as restitutional relief including credits and discounts for certain services.[1] Qwest appealed the MPUC's order to this court, which eventually determined that the restitutional remedies awarded by the MPUC were invalid because the MPUC lacked the statutory authority to impose this type of equitable relief. *See Qwest*

---

**1.** A portion of this restitutional relief includes damage payments for every month in which Qwest did not provide accurate daily usage file information.

*Corp. v. Minn. Pub. Util. Comm'n,* 2004 WL 1920970, at *3 (D.Minn. Aug.25, 2004).

In March 2002, New Access filed a Request for Clarification with the MPUC alleging that Qwest's win back promotion effectively set its retail rate lower than the wholesale rate to which New Access was entitled. New Access argued that the MPUC's wholesale discount order, which set the wholesale rate between Qwest and New Access, should be amended to clarify that what New Access termed the "win back rate" should be construed as the retail rate against which the wholesale discount would apply. New Access sought monetary damages reflecting alleged overpayments. The MPUC held a hearing in May 2002 and found that the win back promotion was unreasonably discriminatory and anti-competitive and disapproved the promotion. The Commissioners did not redefine the retail rate, address New Access's request for damages, determine whether Qwest ought to refund or credit any portion of the charges New Access actually paid, or otherwise award New Access any monetary relief.

On June 12, 2003, New Access filed a Claim and Demand for Arbitration against Qwest with the AAA. New Access asserted that Qwest's win back promotion wrongfully established an effective retail rate lower than the wholesale rate, and sought damages in the amount of the difference between the wholesale amounts actually charged to New Access and the "effective retail rate" calculated by New Access's expert. New Access, which had not been involved in the DOC case, also sought to have the restitutional remedies ordered in the DOC case extended to New Access, including damage payments for every month in which Qwest did not provide accurate daily usage file information.[2]

Qwest filed an action in the District Court of Colorado seeking to enjoin the arbitration proceedings, arguing that examination of Qwest's win back programs and any resulting damages was within the exclusive jurisdiction of the various state public utilities commissions. The Colorado court denied the injunction, holding that, in accordance with the terms of the ICAs and the rules of the AAA, the arbitration panel itself was required to determine the scope of the arbitration. *Qwest Corp. v. New Access Communications,* No. 03–1278, slip op. (D.Colo. Mar. 31, 2004).

An eight-day arbitration was held in February 2004. Qwest again argued that, under the filed rate and primary jurisdiction doctrines, resolution of New Access's claims was outside the scope of the arbitrators' authority. The arbitrators agreed with Qwest that examination of the legality of the win back promotions was reserved to the primary jurisdiction of the state utilities commissions. (*See* Arbitrators' Award, Wilmes Aff. Ex. 15.) The panel, therefore, determined that it could not address either lawfulness or damages in the seven states other than Minnesota where the public utilities commissions had taken no action. (*Id.*) However, the arbitrators concluded that because the MPUC had already exercised its primary jurisdiction and found the Minnesota promotion unlawful, the panel was permitted to address the damages question with respect to the MICA. (*Id.*) The arbitrators awarded New Access approximately $1.5 million in damages connected to the win back promotion. (*Id.*) The arbitrators also determined that the portion of the restitution remedies awarded in the DOC case related to daily usage file information was properly extended to New Access and awarded

---

**2.** At this point, the appeal to this Court of the MPUC award of these remedies in the DOC case had not yet been decided.

$184,474 in damages and prejudgment interest. (*Id.*)

New Access submitted the arbitration award to the MPUC on June 22, 2004. Shortly thereafter, Qwest filed a motion with the MPUC for an order disallowing or disapproving the award. Qwest argued that the award violated the Act and the doctrine of primary jurisdiction, and that constitutional principles, contract provisions, and governing law prohibited retroactive relief such as was granted by the arbitrators. Following a hearing, the MPUC opted not to issue an opinion, thus allowing the award to stand.

New Access filed an action in state court to confirm the arbitration award, which Qwest removed to this Court. Qwest then filed a motion to vacate the award and filed a third-party claim against the MPUC, alleging that the MPUC was required to explicitly review the arbitration award. New Access filed a motion to dismiss Qwest's motion to vacate. New Access and Qwest each move for summary judgment. The MPUC moves to dismiss the third-party action.

## DISCUSSION

### I. QWEST'S MOTION TO VACATE; NEW ACCESS'S MOTION TO CONFIRM

#### A. Grounds for Vacating the Arbitration Award

■ Strong federal policy supports the enforcement of arbitration agreements, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), and an arbitration award must be enforced unless vacated under one of a very limited number of statutorily or judicially recognized grounds. 9 U.S.C. § 9. The Federal Arbitration Act ("FAA") permits vacating an arbitration award if (1) the award was procured by corruption, fraud, or undue means; (2) there was evident partiality or corruption among the arbitrators; (3) the arbitrators were guilty of misconduct or any other misbehavior by which the rights of any party were prejudiced; or (4) the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. 9 U.S.C. § 10(a). Additionally, the Eighth Circuit has recognized "two extremely narrow judicially created standards for vacating an arbitration award." *Schoch v. InfoUSA, Inc.*, 341 F.3d 785, 788 (8th Cir.2003). Specifically, an award may be vacated if the award is "completely irrational" in that "it fails to draw its essence from the agreement," or if the award "evidence[s] a manifest disregard for the law." *Id.* (citation omitted). Finally, in very limited circumstances, an award may be vacated if its enforcement would violate an explicit, well-defined, and dominant public policy. *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983).

■ "The Supreme Court and the Eighth Circuit have repeatedly emphasized that the scope of a district court's review of an arbitration award is 'extremely limited,'" and that the underlying award "is entitled to an extraordinary level of deference." *Green Tree Fin. Corp. v. ALLTEL*, 2002 WL 31163072 (D.Minn. Sept.26, 2002) (citation omitted). Under any of the standards articulated above, the court is not permitted to reconsider the merits of the award "simply because [the court] might have interpreted the agreement differently or because the arbitrators erred in interpreting the law or in determining the facts." *Schoch*, at 790 (citation omitted). Rather, the court must confirm the award "even if [the court is] convinced that the arbitrator committed serious error, so long as the arbitrator is even arguably construing or applying the contract

and acting within the scope of his authority." *Id.* at 788 (citation omitted).

Qwest argues that the arbitration award should be vacated because the arbitrators exceeded their powers, the award evidences manifest disregard for the law; the award fails to draw its essence from the MICA, and the award violates public policy. The Court addresses each argument in turn.

### 1. Scope of the Arbitrators' Authority [3]

 The scope of an arbitrator's authority is defined by the contract providing for arbitration, *EEOC v. Wafflehouse, Inc.*, 534 U.S. 279, 289, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002), which in this case provided that either party may demand that "any claim, controversy or dispute between the Parties, their agents, employees, officers, directors or affiliated agents" be settled by arbitration conducted under the "then-current rules of the AAA." (MICA § 5.18.) Rules 7 and 43 of the AAA permit an arbitrator to determine the scope of their authority and to "grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties." *See Qwest Corp. v. New Access Communications*, No. 03–1278, slip op. at 11–15 (D.Colo. Mar. 31, 2004). The arbitrators' determination that they were authorized to determine dam-

ages related to the MICA, but could not consider the lawfulness of Qwest's actions or related damages in any other state, was clearly within the plain language of the AAA rules and the arbitration provision of the MICA and provides no basis to vacate the award.

### 2. Manifest Disregard for the Law

 An arbitration award "manifests disregard for the law where the arbitrators clearly identify the applicable, governing law and then proceed to ignore it." *Schoch*, 341 F.3d at 788 (citation omitted). Qwest argues that the arbitration award ignores the filed rate and primary jurisdiction doctrines.[4] The arbitrators identified both the filed rate and primary jurisdiction doctrines and considered each carefully. Specifically, the arbitrators determined that the doctrine of primary jurisdiction precluded them from making decisions with respect to the non-Minnesota ICAs and win back promotions, but, because the MPUC had considered and disapproved the Minnesota win back promotion, thereby exercising its primary jurisdiction, did not effect their consideration of the availability of damages in Minnesota. The arbitrators also acknowledged the filed rate doctrine, and determined that it did not apply in this circumstance. This Court is not called upon to determine whether the arbitrators reached the correct conclusion

---

3. The Court notes that the United States District Court for the District of Colorado's determination, following briefing and argument by Qwest and New Access, that, in this case, the arbitrators were the proper body to determine the scope of their own authority, is conclusive. *See SICK, Inc. v. Motion Control Corp.*, 2003 WL 21448864, at *3 (D.Minn. June 19, 2003) (stating that res judicata bars a party from asserting a claim if (1) a prior judgment was entered by a court of competent jurisdiction; (2) the decision was a final judgment on the merits; and (3) the same cause of action and the same parties were involved in both cases) (citation omitted).

4. The filed rate doctrine is a common law rule forbidding a regulated entity to charge a rate other than the one determined by and on file with the appropriate regulatory authority. *Qwest Corp. v. Scott*, 380 F.3d 367, 374–75 (8th Cir.2004). The primary jurisdiction doctrine requires that the resolution of issues within the special competence of an administrative body be first determined by that body. *Great Plains Coop. v. Commodity Futures Trading Comm'n*, 205 F.3d 353, 355 (8th Cir. 2000) (citation omitted).

with respect to these doctrines, but must only ensure that the doctrines were, in fact, considered. *See Schoch, supra,* at 790. Far from ignoring these doctrines, the arbitrators exhibited careful consideration of the relevant law and made a clear effort to craft an award within the law.

Qwest also argues that the award ignores the requirement that only the public utilities commissions set rates. The arbitrators clearly considered their award to be remedial damages rather than a rate adjustment. The explicit language of the AAA rule permitting the arbitrators to award any remedy or relief clearly encompasses the authority to award damages to an injured party. Furthermore, the fact that the arbitrators looked to the wholesale rate and a hypothetical "effective retail rate" in calculating the damages award does not convert a discrete penalty for wrongful actions during a finite time period from a damages award into a new rate. Therefore, the Court does not find this to be an example of manifest disregard for the law.

Finally, Qwest argues that the arbitrators' additional award relating to Qwest's failure to provide daily usage file information constituted manifest disregard for the law because such an award is beyond the type of remedy that the MPUC can grant. Following the arbitrators' decision, one court in this district found the MPUC's restitutionary award, which the arbitrators extended to New Access, beyond the MPUC's powers and, therefore, unlawful. However, in extending the MPUC's award to New Access, the arbitrators did not have the benefit of that court's decision and could only rely on the then-existing law. At the time of the arbitrators' decision, Minnesota caselaw addressing the MPUC's authority to award equitable relief established that the MPUC had both explicit and implicit statutory authority to award a range of equitable

remedies, but did not clearly define that range. *See In re Minnegasco,* 565 N.W.2d 706 (Minn.1997) (noting that the statute should be construed in a sensible manner to avoid unreasonable, unjust, or absurd results and finding proper the MPUC's award of a recoupment remedy to compensate company for lost revenue); *People's Natural Gas Co. v. Minn. Pub. Utils. Comm'n,* 369 N.W.2d 530 (Minn.1985) (finding that the MPUC lacked authority to require a utility to refund improperly collected revenues). In light of the unsettled nature of this area of law, and the then-standing decision of the MPUC, the arbitrators' determination that the MPUC's award was properly extended to New Access does not indicate disregard for the law. *See Schoch, supra,* at 790 (stating that the court may not reconsider the merits of an arbitration award simply because the arbitrators erred in interpreting the law).

The Court finds no manifest disregard for the law and will not vacate the award on this basis.

### 3. Essence of the MICA

"An arbitrator's award draws its essence from the [parties' agreement] as long as it is derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention." *Schoch,* 341 F.3d at 788 (quotation omitted). Qwest contends that the award is not drawn from the MICA because the arbitrators failed to explicitly acknowledge that the MICA incorporates the retail and wholesale rates, specifies how and when those rates may be changed, and permits short-term promotional offerings. The arbitrators acknowledged that valid short-term promotional rates did not need to be discounted under FCC rules, but noted that the MPUC had found

that Qwest's win back promotion was not a valid short-term promotion and had, in fact, been unlawful. The arbitrators, therefore, awarded New Access damages directed at remedying Qwest's wrongful behavior. Because the arbitrators awarded damages, rather than imposing a new rate, the rate setting and changing provisions of the ICAs are irrelevant to the arbitrators' award. Therefore, the Court finds that the arbitration award is soundly based in the parties' agreement.

### 4. Public Policy

 There is no broad judicial power to set aside arbitration awards as against public policy. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). Rather, in very limited circumstances, a court may vacate an arbitration award where enforcement of the award would violate some explicit, well-defined, and dominant public policy. *See Id.*, at 43. Qwest argues that the award violates the public policies behind the primary jurisdiction and filed rate doctrines. Assuming that these policies are of the sort that could support vacation of an arbitration award, *see id.* (noting that obedience to judicial orders and voluntary compliance with Title VII qualify, but finding that a common sense public policy against the operation of dangerous machinery while under the influence of drugs did not qualify), the Court finds that the award does not violate the public policies behind either doctrine. As noted above, the arbitration panel reasonably concluded that neither the primary jurisdiction doctrine nor the filed rate doctrine were violated by its award of damages related to Qwest's actions in Minnesota. If the Court cannot find that the doctrines themselves have been violated, it also cannot find that the policies behind the doctrines have been violated.

### 5. Miscalculation of the Daily Usage Files Award

Qwest argues that the arbitrators materially miscalculated this portion of the award. The arbitrators carefully examined the documentation and testimony offered by New Access and, ultimately, awarded the damages amount requested by New Access plus a 6% rate of interest required by Minnesota statute. The Court finds that the arbitrators' employed a reasonable and sensible method of calculating the award.

### B. Conclusion

Having found that none of the statutory or judicially created grounds for vacating an arbitration award apply, the Court denies Qwest's motion to vacate arbitration award and must, therefore, grant New Access's motions to dismiss Qwest's motion to vacate and to confirm the award. 9 U.S.C. § 9 (directing the Court to grant an order to confirm an arbitration award unless the award is vacated, modified, or corrected).

## II. THE MPUC'S MOTION TO DISMISS

Qwest argues that the MPUC's failure to disapprove the arbitration award violates the primary jurisdiction doctrine, filed rate doctrine, and usurps the MPUC's rate-making authority and requests the Court to overturn that action. The MPUC moves to dismiss the action.

### A. Standard of Review

The Court reviews the MPUC's interpretation of federal law *de novo*, but applies an arbitrary and capricious standard to any findings of fact. *U.S. West Communications, Inc. v. Minn. Pub. Utils. Comm'n*, 55 F.Supp.2d 968, 970 (D.Minn. 1999); *see also Mich. Bell Tel. Co. v. MFS Intelenet of Mich. Inc.*, 339 F.3d 428, 433

(6th Cir.2003); *Southwestern Bell Tel. Co. v. Apple,* 309 F.3d 713, 717 (10th Cir.2002).

### B. The MPUC's Action

■ Initially, the MPUC asserts that it took no action with respect to the arbitration award and argues that judicial review is only available where the MPUC undertakes an action with respect to an ICA dispute. The Court finds this argument unavailing. By allowing the award to stand, the MPUC acted, producing a concrete result, just as a rejection of the award would have. The Act clearly contemplates judicial review of MPUC actions, and the MPUC may not avoid federal court review of its determinations simply by failing to formally approve or reject a dispute properly placed before it.

### C. The Federal Arbitration Act

Qwest argues that, by failing to disapprove the arbitration award, the MPUC improperly applied the primary jurisdiction doctrine, the filed rate doctrine, and its federally-mandated rate-making authority and asserts that the Court must review the MPUC's application of this federal law *de novo.* The Court finds this argument misplaced.

■ The Court finds that, in implicitly approving the arbitration award, the MPUC's duty was to apply the Federal Arbitration Act, not to re-apply the law that the arbitrators had thoroughly examined and interpreted. To find otherwise would deprive the parties to a private arbitration agreement of the benefit of that bargain and defeat the very strong federal preference in favor of arbitration. *See* section I(A), *supra.* Therefore, this Court examines *de novo* the MPUC's very deferential review of the arbitration award. The Court has determined that none of the grounds raised by Qwest require this Court to vacate the arbitration award. *See* section I, *supra.* Therefore, the Court finds no fault with the MPUC's identical determination, and grants the MPUC's motion to dismiss.

### ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' motions for order to confirm arbitration award [Docket No. 2] and to dismiss counterclaim [Docket No. 17] are **GRANTED;**

2. Defendant Qwest's motion for permanent injunction, for summary judgment, and to vacate [Docket No. 8] is **DENIED;**

3. Third-party defendants' motion to dismiss [Docket No. 13] is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**