*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0064p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

CMC TELECOM, INC.,

      *Plaintiff-Appellant*,

GRID 4 COMMUNICATIONS, INC.,

      *Plaintiff,*

  *v.*

MICHIGAN BELL TELEPHONE COMPANY, dba
AT&T Michigan; J. PETER LARK, Chairman;
MONICA MARTINEZ, Commissioner; and
LAURA CHAPPELLE, Commissioner (in their
official capacities as Commissioners of the
Michigan Public Service Commission),

      *Defendants-Appellees*.

No. 09-2239

_____

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 07-00319—Paul Lewis Maloney, Chief District Judge.

Argued: October 14, 2010

Decided and Filed: March 8, 2011

Before: KEITH, ROGERS, and COOK, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Norman C. Witte, WITTE LAW OFFICES, Lansing, Michigan, for
Appellant. Stephen S. Sanders, MAYER BROWN LLP, Chicago, Illinois, Anne M.
Uitvlugt, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan,
for Appellees. **ON BRIEF:** Norman C. Witte, WITTE LAW OFFICES, Lansing,
Michigan, Gary L. Field, FIELD LAW GROUP, Lansing, Michigan, for Appellant.
Stephen S. Sanders, MAYER BROWN LLP, Chicago, Illinois, Anne M. Uitvlugt,
OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, Jeffery
V. Stuckey, DICKINSON WRIGHT PLLC, Lansing, Michigan, for Appellees.

---

**OPINION**

---

ROGERS, Circuit Judge.    For purposes of interpreting the Federal Telecommunications Act, local telephone service providers can be divided into two categories: incumbents, the established carriers who long held regional monopolies, and competitors, who have entered local markets through channels provided for in the Act. One of these channels is resale, which requires incumbents, like AT&T in this case, to offer all of their retail services to competitors at wholesale prices so that competitors may resell those services to customers. 47 U.S.C. § 251(c)(4). AT&T's retail offerings fall into two groups: published offerings and individualized contracts. Individualized contracts are designed for certain commercial customers based on a variety of customer-specific factors. The manner in which AT&T offers its individualized contracts to competitors for resale is at issue in this case.

Plaintiff CMC, a competitor carrier, claims that with regard to AT&T's use of individualized contracts, the Michigan Public Service Commission has failed to enforce compliance with the Act by (1) allowing AT&T to withhold the terms of these contracts from competitors; (2) upholding AT&T's requirement that competitors resell the contracts only to customers that are similarly situated to existing customers; (3) upholding AT&T's prohibition on competitors' aggregation of end-user volume for individualized-contract pricing; and (4) allowing AT&T to treat competitors' end users, rather than the competitors themselves, as customers in the context of reselling individualized contracts.

The terms of the Act indeed require that AT&T sufficiently disclose terms of its individualized contracts to competitor carriers so that competitors can determine the nature of these retail offerings. Such disclosure does not violate AT&T's statutory duty to protect customer proprietary network information and is not a violation of the Act; therefore, the district court's holding to the contrary must be reversed. On the other

hand, as recognized by the commission and the district court, AT&T's requirement of similarity of customer situation—the "similarly situated requirement"—is not a condition on resale, and therefore does not implicate the Act's presumption of the invalidity of such conditions. However, the process by which AT&T determines whether two customers are similarly situated may be an invalid condition on resale. CMC has yet to present properly its concerns about this process to the state commission, so it was premature for the district court to identify particular factors that AT&T could use in determining customer similarity before the commission has made any determination regarding the process. Finally, CMC's aggregation and end-user claims are also without merit.

In August 2006, CMC, along with other parties no longer involved in the suit, first brought its complaint to the commission. An ALJ held hearings on the complaint and issued a proposal for decision in which he recommended that the commission require AT&T to disclose the terms of its individualized contracts while redacting subscribers' identifying information. The ALJ rejected CMC's claims regarding the "similarly situated" requirement, aggregation, and end-user determination.

The commission's order rejected the ALJ's recommendation that AT&T be required to disclose redacted versions of its individualized contracts. The commission also determined that the "similarly situated" requirement was reasonable on its face. Although the commission emphasized that AT&T's determination of whether two customers were similarly situated must be reasonable, the commission did not make any determination as to whether AT&T's current practices fulfilled that requirement. The commission also held that AT&T's refusal to allow aggregation of individualized contracts was not a violation of the Act and that AT&T could appropriately treat CMC's customers as end users for the resale of individualized contracts.

CMC next brought a declaratory judgment action in federal district court against AT&T and the state commissioners, alleging that each of these rulings violated the Act. The district court rejected all of CMC's claims. The district court held that the Act's requirement that carriers protect customer proprietary network information prohibited

AT&T from disclosing individualized contracts without customer consent, and endorsed the commission's reasoning on CMC's other claims. *CMC Telecom, Inc. v Mich. Bell Tel. Co.*, 654 F. Supp. 2d 677 (W.D. Mich. 2009). Additionally, the district court identified certain factors that AT&T could apply in determining customer similarity without first seeking approval from the commission. *Id.* at 692.

**Disclosure of Individualized Contracts**

The Act requires incumbents "to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c)(4)(A). AT&T acknowledges that its resale duty extends to individualized contracts, but the parties disagree on what constitutes an "offer" for purposes of the Act. CMC's primary argument on appeal is that AT&T is not truly offering its individualized contracts for resale because AT&T will not disclose any information about the contracts unless a competitor first obtains customer consent. Because an offer can exist only if the offeree has enough information to understand what is being offered, AT&T must disclose sufficient terms of its individualized contracts such that competitors can discern the nature of those contracts and offer them to new customers.

AT&T maintains, and the district court agreed, that unconsented disclosure of individualized contracts would constitute a violation of another of AT&T's duties under the Act: the duty to protect customer proprietary network information ("CPNI"). Section 222(c)(1) of the Act provides that:

> [e]xcept as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories.

The Act defines CPNI as:

> information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship.

47 U.S.C. § 222(h)(1)(A).

Because multiple customer-specific factors are considered in designing individualized contracts, AT&T contends that disclosing the terms of these contracts would amount to disclosing CPNI in violation of § 222. The factors AT&T uses in writing individualized contracts include services ordered, customer location, and quantity.[1] Although this information (at least when identified by customer name) clearly constitutes CPNI, AT&T's claim that it would be violating § 222 by disclosing details of these contracts is without merit, because the Act allows for disclosure "as required by law." 47 U.S.C. § 222(c)(1). Section 251 requires incumbents to offer all of their retail services for resale, and thereby constitutes a legal requirement that the terms of individualized contracts be sufficiently disclosed so as to be understood. Because § 251's resale duty constitutes a legal disclosure requirement, § 222 does not prevent AT&T from disclosing terms of its individualized contracts to competitors.

AT&T argues that the exceptions to § 222(a)'s disclosure prohibition are limited to those listed in § 222(d).[2] This argument is inconsistent with case law and the Federal Communication Commission's own interpretation of the Act. In *ICG Communications Inc. v. Allegiance Telecom*, 211 F.R.D. 610, 614 (N.D. Cal. 2002), the court identified the Federal Rules of Civil Procedure as law within the meaning of § 222, and held that

---

[1] AT&T has identified the factors considered in designing an individualized contract as including, but not limited to: services included in the offer, revenue commitment, competitive price in the marketplace and cumulative price differential, pricing proposed or offered for similar product/bundled solutions, location, loop length, cable complement, availability of facilities, wire center, timing and current competitive environment, general state of the economy, network architecture or service configuration, term commitment, quantity commitment, and other risk factors (limitations of liability, warranty, other terms and conditions).

[2] These exceptions include the use and disclosure of CPNI for purposes of billing, protecting carriers' rights, providing customer sales services, and providing customer location information in emergency situations.

a party could therefore be compelled to provide information in discovery that would otherwise be protected CPNI. More recently, the FCC considered the reach of § 222's "except as required by law" language in making a declaratory ruling on the potential conflict between § 222 and 42 U.S.C. § 13032. *In the Matter of Implementation of the Telecomms. Act of 1996: Telecomms. Carriers' Use of Customer Proprietary Network Info. and Other Customer Info.*, 21 FCC Rcd. 9990 (2006). Section 13032, since repealed,[3] required providers of an "'electronic communication service or remote computing service' to report apparent violations of certain federal statutes involving child pornography." The information reported by service providers pursuant to this statute, such as e-mail and ISP addresses, constitutes individually identifiable CPNI, but the FCC has found that reporting is permissible because § 222(c)(1)'s "except as required by law" exception applies. 21 FCC Rcd. at 9991-92. Given that the FCC, the body ultimately responsible for implementing the Act, has itself found that § 222(a)'s exceptions extend beyond those listed in § 222(d) of the Act, AT&T's argument to the contrary is unavailing. *See* 47 U.S.C. § 151 (creating FCC to "execute and enforce the provisions" of the Act).

Aside from the statutory arguments, AT&T's brief reveals that its concerns about disclosing CPNI are largely driven by its desire to avoid sharing its customers' names with competitors.[4] AT&T may be able to avoid this disclosure by providing CMC with redacted versions of the individualized contracts, so long as those contracts contain enough information to constitute an offer. That is, AT&T may be able to anonymize the contracts so that CMC can learn the terms on which AT&T provides individual offers without learning the identities of AT&T's customers.

---

[3] Although that statute has been repealed, the reporting requirement remains and is now found at 18 U.S.C. § 2258A(a).

[4] Both AT&T and the commission indicate that CMC may obtain individualized contract information, including CPNI, by obtaining affirmative customer authorization to release the information after the fact. Indeed, AT&T "placed a form authorization letter on its [competitive local exchange carrier] online website" for CMC's use. However, such a limited process would not be sufficient to meet the requirements of 47 U.S.C § 251(c)(4)(a), in part because it would not serve to provide CMC with a full understanding of the nature of all AT&T's individualized contracts.

With redacted contracts, it is possible that § 222 would not even be called into question, as that section only prohibits disclosure of "individually identifiable" CPNI. However, as AT&T argued below and CMC conceded at oral argument, there may be customers for which even a redacted contract would contain sufficiently distinctive customer-linked data so that competitors could easily recognize the underlying customer. Nonetheless, AT&T is required by law to offer all of its retail services for resale, and this disclosure duty applies even when redaction cannot fully mask customer identity. Therefore, the commission erred in permitting AT&T to withhold completely the terms of its individualized contracts from competitors.

**"Similarly Situated" Requirement**

CMC argues that AT&T further violates the Act by allowing resale of individualized contracts only to customers that are "similarly situated" to the customer for which the contract was designed. As recognized by the district court, there are actually two components to CMC's objection to AT&T's "similarly situated" requirement: the first objection is to the requirement itself, and the second objection is to the opacity of the process by which AT&T determines whether one of CMC's proposed resale customers is similarly situated to an existing individualized-contract customer. The answer to CMC's argument is that although the Act significantly limits incumbents' ability to impose "restrictions on resale," AT&T's "similarly situated" requirement is not in itself such a restriction. However, the process by which AT&T determines whether two customers are similarly situated is independent of the requirement itself and may constitute a limitation or restriction on resale that must be approved by the state commission. CMC has not challenged this process before the state commission, and therefore any objection to the process is not properly before this court.

The Act prohibits incumbents from imposing "unreasonable or discriminatory conditions or limitations" on the resale of their retail services. *Id.* § 251(c)(4). The regulations identify two restrictions on resale that incumbents may impose without prior approval: cross-class selling and short term promotions, neither of which is involved in this case. 47 C.F.R. § 51.613(a). Beyond these, incumbents may impose other

restrictions on resale only after proving "to the state commission that the restriction is reasonable and nondiscriminatory." *Id.* § 51.613(b). CMC argues that AT&T disregarded this regulation by imposing its "similarly situated" requirement without first seeking approval from the commission.

However, the "similarly situated" requirement is not a restriction on resale. Rather, it is a way for AT&T to ensure that CMC is reselling the same product that AT&T offers at retail, which is all the Act requires of incumbents. *Sw. Bell Tel. Co. v. Apple*, 309 F.3d 713, 718 (10th Cir. 2002). Individualized contracts derive pricing from a variety of customer-specific factors. Therefore, allowing competitors to sell those specially priced contracts to any customer—regardless of the customer's call volume, location, or other pertinent factors—would distort the nature of the offering and force incumbents to provide discount services to customers who would not qualify for special rates under the incumbent's own pricing scheme.

Although the "similarly situated" requirement is not a restriction or limitation on resale, the requirement is distinct from the process by which AT&T determines whether two customers are similarly situated. This is because the requirement itself is simply a way of ensuring that competitors are only reselling products that AT&T sells, whereas the determination of which customers are similarly situated to others, if not transparent, could be used unlawfully to prevent resale of existing products to virtually identical customers. As currently structured, AT&T alone determines whether a competitor's proposed customer is similarly situated to an existing individualized-contract customer. Therefore, competitors prepared to offer individualized contracts to similarly situated customers must successfully clear AT&T's undisclosed determination process, and that process could be a limitation or restriction on resale that must be approved by the commission. However, CMC's complaint to the commission focused on the requirement itself, and any concerns about the process have not been properly presented to the commission. In fact, the commission emphasized that the process must be reasonable and nondiscriminatory. Without a ruling from the state commission, CMC is not positioned to argue to this court that the commission has violated federal law with

respect to this issue. As suggested by the commission, CMC and AT&T may devise a scheme for determining similarity of situation in negotiating their interconnection agreement. Or, as it did with its initial claims in this case, CMC may file a complaint with the commission addressing this issue.

Because it is initially for the commission to determine whether the process by which AT&T makes its "similarly situated" determination is reasonable, the district court was premature in articulating a set of appropriate factors to be considered in the process before the commission has properly considered the matter. The district court below held that particular factors articulated in the *Bell Atlantic-Delaware v. McMahon*, 80 F. Supp. 2d 218 (D. Del. 2000), decision were reasonable and non-discriminatory. *CMC Telecom,* 654 F. Supp. 2d at 692. Neither this court nor the district court is in a position to prescribe beforehand what factors the commission could or should apply. On subsequent review, we can determine whether the analysis applied by the commission is consistent with the Act.

**Aggregation of End-User Volume**

CMC also contends that the state commission violated the Act by refusing to require AT&T to allow competitors to aggregate end-user volumes in order to qualify for individualized-contract pricing. This argument is without merit because it disregards the nature of individualized contracts.

CMC argues that if AT&T sells 10,000 units of service to one customer as part of a multi-factor individualized contract, AT&T must allow CMC to buy 10,000 units of service at the relatively low individualized-contract rate, identify and aggregate 10,000 distinct customers who each demand only one unit of service, and then parcel out the service among those customers at the resale rate for individualized contracts. CMC cites the FCC Local Competition Order for the proposition that restrictions on resale of volume discounts "should be considered presumptively unreasonable." *In the Matter of Implementation of the Local Competition Provisions in the Telecomms. Act of 1996*, 11 FCC Rcd. 15499, 15971 (1996). However, that presumption would apply here only

if volume were the sole factor AT&T considered when pricing its individualized contracts. Because the contracts CMC seeks to resell are based on several factors in addition to call volume, requiring AT&T to allow aggregation of end-user volume to qualify for individualized contract rates would change the nature of AT&T's retail offering and exceed AT&T's resale requirement. Where eliminating a restriction from an incumbent's retail offering would transform the offering into a different service, the incumbent is not required to offer that revised service for resale. *Sw. Bell*, 309 F.3d at 719-20. Were AT&T required to resell multi-factor individualized contracts based on volume requirements alone, the resold product would not be what AT&T offers its own customers.[5] Therefore, the commission did not legally have to require AT&T to permit aggregation to qualify for individualized-contract pricing.

**End-User Determination**

CMC also argues that AT&T should be required to treat CMC, rather than CMC's resale customers, as the end user for purposes of reselling an individualized contract. This claim is not independently developed at any length in CMC's brief, but is instead nested within CMC's argument that AT&T should be required to allow volume aggregation for purposes of purchasing individualized contracts at wholesale rates. CMC's end-user argument is indistinct from its aggregation argument, and likewise fails.

**Conclusion**

In conclusion, AT&T must disclose the terms of its individualized contracts to the extent necessary for CMC to understand the nature of what is being offered. The district court's holding is reversed in this respect, and the case must be remanded for the commission to modify its order. The district court's affirmance of the commission is otherwise upheld. The commission did not violate the Act by determining that AT&T's "similarly situated" requirement was not a restriction on resale. However, the process

---

[5]Because the terms of AT&T's individualized contracts are currently unknown, it is possible that some of these contracts are simply volume discounts packaged as "individualized" offerings. As explained above, AT&T will be required to disclose critical terms of its individualized contracts going forward. If this disclosure reveals special contract rates that are driven solely by volume, CMC could renew its aggregation argument before the commission.

by which AT&T determines whether two customers are similarly situated is independent from the retail offering and may be a condition on resale in the context of this case. Because CMC has yet to properly present complaints about the determination process to the commission, there is no decision on the reasonableness of particular factors before us on review. Our holding in this regard supersedes the district court's adoption of particular factors that AT&T may reasonably consider in determining whether two customers are similarly situated. Finally, we uphold the district court's determinations that the commission could permit AT&T to refuse to aggregate individual-contract volumes and to refuse to treat competitors as end users for resale purposes.